## Knights of Maccabees of the World v. Shields.

(Decided December 4, 1913).

### Appeal from Nelson Circuit Court.

1. Insurance, Life—Falsity of Answers to Material Questions Propounded to Applicant—Effect of.—The general rule is that when an applicant for insurance makes false answers to material questions in the application, these false statements will avoid the policy without reference to whether they were made in good or bad faith or whether they were known to be false by the applicant.

2. Insurance, Life—Evidence as to Falsity of Material Answers.—When an issue is made as to the falsity of material answers, it is permissible to introduce any relevant testimony tending to show the falsity of the answers relied on to defeat the insurance.

3. Insurance, Life—Evidence—Competency of declarations of Insured Impeaching Verity of Application.—It is quite generally ruled by the courts that where an insurance contract has been entered into

between the insured and a regular or old line insurance company for the benefit of a third party who acquires a vested interest in it, the rights of the beneficiary cannot be prejudiced by declarations made by the insured subsequent to the contract; but this rule will not be applied to benefit or fraternal insurance societies, and in an action brought to recover on a policy in a benefit or fraternal society, evidence of subsequent declarations of the insured tending to impeach the truthfulness of his answers made in the application are competent.

4. Insurance, Life—Instructions—"Offending Party."—Where the policy provides that the insurance shall not be recovered if the insured is killed in a quarrel in which he is the "offending party", the insured is the "offending party" if he brings on the difficulty that ends in his death by assaulting the person who kills him, unless he believes or has reasonable grounds to believe that it was necessary to act in the manner he did to protect himself.

5. Insurance, Life—Evidence of Reputation of Insured for Peace and Quiet.—In an action to recover the amount of an insurance policy, where it was sought to defeat it upon the ground that the insured was killed in a quarrel in which he was the offending party, it was not competent to prove his general reputation for peace and quiet or that he was a violent, dangerous and quarrelsome man.

NAT W. HALSTEAD, G. ALLISON HOLLAND and JOHN A. FULTON for appellant.

KELLEY & CHERRY for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant is a secret fraternal insurance association, incorporated under the laws of Michigan, and transacts its business through local and subordinate lodges called "tents," under the supervision of a grand council called the "supreme tent."

One of its local tents was located at Chaplin in Nelson County, Kentucky. On February 28, 1911, Dr. A. M. Shields, a practicing physician located at Chaplin, made application for membership in the Chaplin tent, on the printed blank furnished by the association, and, as a part of his application, applied for a benefit certificate in the association for $1,000, to be made payable to his wife, Dora Shields, the appellee herein.

In his application he was asked and answered a number of questions, among them the following: "Q. Are you in good health at the present time? A. Yes. Q. Have you consulted a physician during the past ten years? A. No. Q. Have you ever had any of the following complaints, diseases or symptoms—disease of

genital or urinary organs; disease of kidneys? A. No. Q. Have you had any illness, ailment or injury not herein mentioned? A. No. Q. Have you carefully reviewed the answers to the above questions and do you warrant and agree that they are written as stated by you and that they are true in every particular? A. Yes." Following these answers is this warranty:

"I hereby agree and warrant that the above as written are true answers to the foregoing questions, and that any untrue answer * * * shall vitiate my benefit certificate and forfeit all payments made thereon. * * * I hereby expressly agree that the laws of the Knights of the Maccabees of the World in force at my death, together with this application and my certificate of membership shall form the basis and constitute the contract for beneficial membership between myself and the Knights of the Maccabees of the World."

At the same time and place that Dr. Shields signed this application Dr. Pope, a physician acting for the association, answered on a printed form a number of questions concerning Dr. Shields. Among the questions asked Dr. Pope and answers made by him were these:

"Q. Examination of urine: Was it passed in your presence? * * * Q. Color of urine? A. Normal. Q. Specific gravity? A. 1018. Q. Albumen? A. No. Q. Sugar? A. No." Following the answers to the questions, Dr. Pope certified among other things: "I have carefully reviewed with applicant the accompanying application, and that applicant's answers made in the other parts of this blank I believe to be true and exactly as made by applicant." It is shown, however, that Dr. Pope never made any examination and that he merely put down such answers as he was directed to do by Dr. Shields.

On February 6, 1911, and before the benefit certificate for $1,000 had been issued, or at least before it had been delivered to Dr. Shields, he applied to the local tent to change the certificate from $1,000 to $3,000. His application for the additional increase was communicated to the proper officer of the association, and this officer forwarded to the local tent what is called a health certificate, that was required to be answered and signed by Dr. Shields before his application for an increase in benefits could be issued.

On February 15, 1911, Dr. Shields signed the required health certificate containing, among others, the following questions and answers:

"Q. Are you in good health at the present time? A. Yes. Q. How many times have you consulted a physician during the past ten years? A. None. Q. Have you had any illness, ailment or injury not herein mentioned? A. No." Following these questions and answers is this warranty.

"I hereby agree and warrant that the above as written are true answers to the foregoing questions and that these statements, together with my original application for membership in this association, and the laws of the Knights of the Maccabees of the World in force at my death or disability, together with my certificate of membership, shall form the basis of this contract for beneficial membership, and that any untrue answers or any suppression of facts shall vitiate my benefit certificate and forfeit all payments made thereon."

After this health certificate had been forwarded to the home office of the association, there was issued to Dr. Shields on March 2, 1911, a benefit certificate for $3,000. In this certificate it was recited that:

"This certificate is issued because of an application for membership and medical examination furnished by the member in writing, signed by him, and warranted to be absolutely true in every particular as written, which application, medical examination, laws in force at maturity of contract, and the certificate constitute the contract between the member and the association at his death."

On September 29, 1911, Dr. Shields was shot and killed in an altercation with one Preston Neal. Within a short time after his death payment of the $3,000 was demanded by his widow, the beneficiary, and upon the refusal of the company to pay this amount, this suit was brought.

In its answer the association pleaded that the answers to the questions heretofore set out contained in the application and health certificate were material to the risk and were false and known to be so by Dr. Shields at the time they were made. That when the application was made and when the health certificate was signed, he was not in good health, but, on the contrary, was in bad health, suffering with an incurable disease known as diabetes. That his answer that he had not consulted a

physician within the past ten years was false, as he had consulted one several times within that period.

It was further pleaded that his application would not have been accepted or either of the certificates issued if the association had known the truth as to the condition of his health. It was also averred that the statements made by the medical examiner heretofore set out were false and material to the risk.

Another defense relied on was based on this clause in the by-laws of the association: "No benefits shall be paid on the death of or disability of any member who has been killed or injured in any quarrel, controversy or fight in which such member is the offending party;" it being averred that he was killed in a quarrel with Preston Neal at a time when he was the offending party.

Other pleadings completed the issues, and upon a trial before a jury there was a verdict and judgment in favor of the appellee for $3,000, the amount of the benefit certificate.

Before taking up the grounds relied on for reversal, it may be well to notice the question raised by counsel for appellee, that the association cannot rely, to defeat a recovery, on the false answers in the health certificate signed by Dr. Shields on February 15, on the faith and credit of which his benefit certificate was increased from $1,000 to $3,000. We think, however, the association had the right to rely upon the answers made in the health certificate, as well as on the statements made in the original application.

It is sought here to recover $3,000 on the certificate that was issued after the association had received the health certificate made out by Dr. Shields on February 15, and the uncontradicted evidence is that this increased certificate would not have been issued until a satisfactory health certificate was made out and received by the association. The laws of the order also seem to provide that increased insurance shall not be issued to a member until he has made, and the association has accepted, a health certificate such as was required of Dr. Shields. Under these circumstances, we think the answers made by Dr. Shields in the health certificate, as well as those that relate to the original examination, were parts of the contract of insurance, and this being so, it was competent to show the falsity of the answers in each of them.

The application made by Dr. Shields was the basis of the contract. It was indispensable to his admittance

into the association. On the faith and credit of the statements in this application and the statements in the medical application, he was enabled to become a member of the association and to receive the benefit certificate for $1,000. After thus becoming a member he was enabled by virtue of the satisfactory statements contained in the health certificate to have the benefit certificate increased from $1,000 to $3,000.

It is true this health certificate, which is a printed form blank, on the face of it indicates that it was only intended to be signed and executed by an applicant who had been approved more than thirty days, but we attach no importance to this erroneous statement at the head of this certificate. It only tends to show that by inadvertence or mistake the wrong form of health certificate was sent to Dr. Shields to be signed. The material thing is that this certificate contained questions to which Dr. Shields made certain answers, on the faith and credit of which he obtained a benefit for $2,000 more than he could have obtained except for the answers made in this health certificate. Another fact that may be here noticed is that he agreed in the health certificate that it and his application together with the laws of the order should constitute the contract.

On the trial of the case it was shown that in June, 1911, Dr. Shields testified in a suit of one Rowland against him, then on trial in the Spencer Circuit Court, that on January 31, 1911, he was in bad health and had been for about a year and that he had a number of boils on his person and had lost about fifty pounds in weight. It was further shown that on February 18, 1911, three days after the health certificate was signed, Dr. Shields called on Dr. Gilbert, a well-known physician of Louisville, and requested Dr. Gilbert to subject him to a medical examination for the purpose of ascertaining the condition of his health, and Dr. Gilbert testifies that he found some abscesses and suppurating sores upon his body, and, after examining his urine, advised him that he was suffering from diabetes in an aggravated form.

Dr. Cottell testified that on February 19, 1911, which was the day after Dr. Shields had consulted with Dr. Gilbert, he came to see him and told him that he was suffering with diabetes. Dr. Cottell further testified that he made an examination and found that he was suffering with this disease, and his impression was that Dr. Shields told him he had the disease for probably a year.

Dr. Crume testified that some weeks after Dr. Shields had seen Dr. Cottell, he called on him, and he found upon examination that he had a severe type of diabetes. He further said that he had treated Dr. Shields in a medical way within a year before January, 1911.

A number of other witnesses were introduced by both parties for the purpose of showing upon hypothetical questions the probable length of time Dr. Shields had been afflicted with this disease prior to his interview with Dr. Gilbert, when it appears he was first told that he had it. Some of them testified that he probably had the disease for one or two years, others that it might have been or very recent origin.

The court, after admitting this medical evidence, instructed the jury orally that "the testimony as to any statements made by Dr. Shields to Dr. Cottell is not to be considered by you as evidence of any admission of Dr. Shields that he had diabetes at the time he made application for the insurance, nor is it to be considered by you as evidence that he did have diabetes at that time; but if from other evidence in the case you reach the conclusion that he did have diabetes at the time he made the application, his statements may be considered as to whether or not he had knowledge of it. They are to be considered neither as an admission that he did have diabetes nor as evidence that he did have it. It is solely a question as to whether or not he knew he had it."

We think this limitation on the effect the jury might give to the evidence of Dr. Cottell was misleading and erroneous. The evidence of Doctors Cottell, Gilbert, Crume and others tended to show that Dr. Shields had diabetes and therefore was not in good health on January 28th, and on February 15th, and if he was not in good health and had this disease on either of those dates his statement in the application and health certificate that he was in good health and not diseased was false and material to the risk. Whether or not he knew his health was good is not so important. The vital question is, was his health good and was he free from disease when he so stated in the application and health certificate? If in truth his health was not good on those dates, and if in fact he was suffering on those dates with this incurable disease, the concurrence of these conditions avoided the policy, although Dr. Shields may not have known that his answers to these questions were false. Upon this

point we said in Masonic Life Assocation v. Robinson, 149 Ky., 80:

"Section 639 of the Kentucky Statutes provides that: 'All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties; nor shall any misrepresentation, unless material or fraudulent, prevent a recovery on the policy.'"

"Under this statute, we have held that a statement as to rejections by other companies is material to the risk, and if false is sufficient to avoid the policy, when it is shown by the uncontradicted evidence, as in this case, that the company would not have issued the policy had it known of the rejections, and this is so whether the insured at the time of making the application remembered or had in mind the fact of previous applications and rejections or not, and without regard to whether his answer was or not in good faith and without any intention to deceive."

And this rule, that the situation is not affected by the good or bad faith of the applicant, or whether he knows or does not know the falsity of his answers that are material, applies to every material question and answer intended to advise the company of then existing conditions with respect to the applicant. Provident Savings Life Assurance Co. v. Dees, 120 Ky., 285; Ill. Life Insurance Company v. Delang, 124 Ky., 569; Provident Savings Life Assurance Society v. Whayne, 131 Ky., 84; Metropolitan Life Insurance Co. v. Schmidt, 29 Ky. L. R., 255; Brisou v. Metropolitan Life Insurance Co., 115 S. W., 785; Supreme Lodge of Knights of Phythias v. Bradley, 141 Ky., 334; National Protective Legion v. Allphin, 141 Ky., 777; Blenke v. Citizens Life Insurance Co., 145 Ky., 332.

As the association, under the facts of this case, had the right to defeat a recovery by showing that certain answers made by Dr. Shields in his application and health certificate were both material and false, it was permissible for it to introduce any relevant evidence tending to show the falsity of the answers relied on to defeat the certificate, and this evidence should have been admitted without limitation or qualification by the court. The weight to be attached to it was for the jury.

It is said, however, that the statements Dr. Shields made, if any, subsequent to the dates when he signed the application and health certificate, tending to impeach the verity of his answers, were not admissible as evidence,

and in support of this contention we are referred to a number of authorities, among them Rawls v. American Mutual Life Insurance Co., 27 N. Y., 282, 84 Am. Dec., 280; Harley v. Heist, 86 Ind., 196, 44 Am. Rep., 285; Grangers' Life Insurance Co. v. Brown, 57 Miss., 308, 34 Am. Rep., 446; Union Central Life Insurance Co. v. Cheever, 36 Ohio State,. 201; McGowan v. Supreme Court, 104 Wis., 173; Union Central Life Insurance Co. v. Pollard, 94 Va., 146, 36 L. R. A., 271.

It is quite generally ruled by the courts that where an insurance contract has been entered into between the insured and a regular or old line insurance company, for the benefit of a third party who acquires a vested interest in it, the rights of the beneficiary cannot be prejudiced by declarations made by the insured subsequent to the contract. A few courts also hold that this principle should apply to insurance obtained in benefit or fraternal societies or associations, although a majority of the courts hold, and as we think correctly, that this rule, however sound it may be when applied to contracts of insurance in old line companies, should not be applied to insurance in benefit or fraternal associations. In the note to Taylor v. Grand Lodge A. O. U. W., 101, Minn., 27, that may be found in 11 L. R. A. (n. s.), page 92, a number of cases on this subject are collected.

Without expressing any opinion as to the correctness of this rule in its application to old line companies, we are of the opinion that it should not be extended to benefit or fraternal insurance societies. Taking this case as an example; the beneficiary in this certificate had no vested interest in it. Under the laws of the association Dr. Shields had the right at any time, upon complying with certain requirements of the association, to change the beneficiary. Aside from this, the rights of Mrs. Shields as a beneficiary depended entirely upon Dr. Shields retaining his membership in the association. He could have withdrawn from the association at any time he saw proper thereby forfeiting his right to benefits and have thus defeated the right of his wife to the insurance. In other words, Dr. Shields controlled entirely the disposition of any benefits he might be entitled to under the laws of the association, and so was really the only party in interest. This being so, there does not seem to us any good reason why the general rule that admissions or declarations of a party are admissible against himself should not be applied in a contest between the association

and some person who, by the mere option or grace of the member, happens to be the beneficiary for the time being. Bacon on Benefit Societies, Third Edition, Vol. 2, Sec. 460

In view of the evidence we have noted in reference to the condition of Dr. Shields' health, it is strongly insisted that a verdict should have been directed in favor of the association. The weight of the evidence tends to support the conclusion that Dr. Shields was suffering with diabetes at the time the statements were made by him upon which the insurance was obtained, but there is evidence conducing to show that he was not afflicted with disease at this time, so that we think the question was for the jury.

It is further argued that the evidence shows conclusively that he was the "offending party" in the quarrel with Neal, and this being so, no recovery can be had. There is evidence tending to show that he was the offending party within the meaning of the contract of insurance, but it is not so conclusive as to warrant us in saying that no recovery should be had. Upon this point, if the jury believed from the evidence that Dr. Shields was the offending party they should have found for the association, and he was the offending party in the difficulty with Neal if he brought it on by advancing on Neal in a threatening manner with a stick or cane, unless he in good faith believed and had reasonable ground to believe that he was then and there in danger of losing his life or suffering great bodily harm at the hands of Neal, and it was necessary or appeared to him to be necessary, that he should act in the manner he did to protect himself from the threatened assault of Neal. On another trial of the case the court should in lieu of the instruction given on this subject, instruct the jury in substance as we have indicated.

A further argument is made that the court erred in refusing to permit a number of witnesses offered by the association to testify that the general reputation of Dr. Shields for peace and quiet was bad and that he was a violent and dangerous man. We do not think this character of evidence was competent. The question here to be determined related to the single inquiry, was Dr. Shields, in this quarrel that ended in his death, the offending party? If he was the offending party, his conduct defeated the right to benefits. If he was not the of-

fending party, the right to benefits remained unaffected by the manner of his death. His reputation for peace or quiet or good behavior was not in issue. It was not material whether he was a violent, turbulent and dangerous man or a peaceable, quiet, law-abiding citizen. Whether he was the one or the other, if he was the offending party in this quarrel, he forfeited his right to benefits; and the question whether he was the offending party is to be determined by his acts and conduct on this particular occasion. The only issuable fact on this point is, was he at the time of his death the offending party?

It seems that on the trial of the case there was an effort made to get before the jury the number of children Dr. Shields had and their ages, and the date  of  his marriage with the beneficiary, and the fact that some efforts had been made to compromise the case. All evidence of this character was incompetent. It was not at all material when Dr. Shields was married or how many children he had nor was it competent to show the efforts to effect a compromise.

Wherefore, the judgment is reversed, with **directions** for a new trial in conformity with this opinion.