## Sovereign Camp Woodmen of the World v. Thomas.

(Decided May 25, 1920.)

### Appeal from Grayson Circuit Court.

1. Insurance—Life—Effect of Questions and Answers in Application.—Where an applicant for insurance said in his application that he had never had any of the following named "diseases or symptoms . . . indigestion . . . or any other disease of the digestive system," and in answer to the question "have you consulted or been attended by a physician for any disease or injury for the past five years?" said "no;" and these answers were shown by the evidence to be false, there could be no recovery on the policy issued to the applicant on the faith of his application that contained these questions and answers.

2. Insurance—Life—Answers Must be Material or False to Defeat Policy.—The answers of an applicant for insurance, although they may be false, will not defeat the recovery of the insurance unless they are material.

ROBERT L. PAGE, L. D. GREENE and ALLEN CUBBAGE for appellant.

HAYNES CARTER for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL— Reversing. .

This is a suit by Susie Thomas, the widow and beneficiary of A. W. Thomas, to recover from the appellant,

Woodmen of the World, the amount of a policy for $1,000.00 issued to A. W. Thomas. Upon refusal to pay the policy, Mrs. Thomas brought this suit, and, after a trial in the circuit court, there was a judgment in her favor for the amount of the policy, and the defendant appeals.

The grounds upon which her right to recover upon the policy were contested are of such a nature as to require an extended statement of the facts.

On December 27, 1916, A. W. Thomas made application to the local camp of Woodmen, at Leitchfield, Kentucky, to become a member entitled to participate in its insurance scheme, and at the time of his application he was asked the following questions and made the following answers thereto: "Have you now or ever had any disease of the following named organs, or any of the following named diseases or symptons, . . . colic, gall stones, . . . indigestion, . . . or any other disease of the digestive system?" Answer: "No." "Have you consulted or been attended by a physician for any disease or injury during the past five years?" Answer: "No."

His application was accepted, and on January 13, 1917, a certificate of insurance for $1,000.00 was delivered to him. On the next day he died from an attack of acute indigestion, and payment of the policy was resisted upon the ground that the answers made by Thomas to these questions were material and false.

A reversal is asked upon the ground that the court erred in refusing to direct the jury to find for the Woodmen of the World; that the verdict was flagrantly against the evidence, for errors committed in rejecting competent evidence, and in the instructions to the jury.

On behalf of the Woodmen, T. F. Willis testified that he had known Thomas about two years just preceding his death, during which time he had lived at Leitchfield; that he had heard him on three different occasions speak about "spells" he had.

"Q. What did he say the spells were? A. The last morning he talked to me, the day he died, he said the doctors claimed it was acute indigestion. Q. Did he say where he suffered, what hurt or pained him, or describe his suffering? A. Yes; he told me all about it. Q. What did he tell you? A. He said it was in his stomach. Q.

Did he say whether or not the spell was slight or severe, or what description did he give? A. He said it was severe, and went on to tell me he believed if he hadn't trusted in God, it was severe enough it would have killed him, you know. Q. When did you say was the first time you had a conversation with him, that he told you something about his condition cf health? A. It was some three or four months, the first conversation. Q. Three or four months before his death? A Yes, sir. Q. Tell the jury what he told you in that conversation with reference to his condition of health, or any spell? A. He said, 'I had a spell when I was living at the fair grounds, and thought I was going to pass away.' Then he told about the first time. Q. What sort of spell did he say that was? A. He pronounced it then, he thought it was something like bilious colic. Q. He characterized it as some sort of stomach trouble, did he? A. Yes, sir. Q. Did he say on that occasion whether he suffered much or little, whether it was serious or slight? A. Yes; he said it was serious."

W. B. Hill had several conversations with Thomas and gave evidence to the same effect as that of Willis.

Dr. J. R. Perry testified that he was a practicing physician, and had attended in a medical capacity A. W. Thomas. "Q. Did he ever consult you personally, or did you ever attend him as a physician? A. Yes. Q. State as near as you can the time or times that you have attended him? A. I really can't say the number of visits I attended him at his home, but it was in November and December, 1912, to the best of my knowledge. Q. He consulted you, and did you attend him during these two months you speak of more than once? A. Yes. Q. What was the trouble complained of by Mr. Thomas at the time or times you visted him? A. Gastritis. Q. What is gastritis? A. An inflammation of the stomach. Q. Doctor, I will get you to state whether or not you so advised him at the time of his ailment? A. Yes. Q. At the time you speak of treating him in 1912, did he tell you what was the matter with him, or did you tell him what you thought was the matter with him? A. I told him. Q. Did you find that he had any disease of the digestive system? A. Yes. Q. What was that? A. Gastritis. Q. Did you find this trouble cf Thomas' temporary or

chronic? A. I would not have called it chronic at the beginning, the first time I saw the attack.''

Dr. S. H. Armes testified that about five or ten days before the death of Thomas, he was called to see him once only, and found him suffering with severe pains in the region of his stomach, that the symptoms indicated that he was suffering with a case of indigestion. ''Q. Did you advise him of his ailment, what you thought was his trouble? A. I think so; the best I remember, I did. Q. What percentage, in your judgment, of the people, suffer at times temporarily from what the laity call 'indigestion?' A. I don't know what per cent, but quite a number of people. Q. Wouldn't you suggest the vast majority? A. Yes, I think the majority. Q. The fact is, indigestion is a term used to cover a number of disorders and illnesses? A. Yes, sir.''

W. L. Bosarth testified that he knew Thomas when he lived at the fair grounds near Leitchfield and lived close to him. ''Q. Did he ever, during the period he lived there close to you, describe or tell you of any impaired physical condition he had? A. Yes sir; he told me that that he had a stomach trouble and there was certain things he couldn't eat on account of the fact that they hurt him. Q. Did he tell you what those things produced as a rule, if he ate them? A. Well, I couldn't say now that he did. He just said he couldn't eat them on that account. Q. Did he tell you at that time what they did to him, how they affected him? A. Well, as well as I remember, he said they kind of cramped him, or something of the kind, that they hurt his stomach, it hurt him so he didn't eat them at all, just left them off. Q. On how many occasions did he tell you that? A. I couldn't say, he was there at my house some several times. Q. Did he during that time, or at any time, tell you of being out on his business trips and being overtaken with some trouble of that sort? A. Yes sir. Q. Did he say to you he suffered much or little pain? A. Yes; he said sometimes he thought he wasn't going to make it at all. Q. Now then, did the condition he described to you at that time occur during the last two or three years of his life or not? A. Yes, sir; I don't remember just the last time he said about it, but it wasn't any great while before his death. Q. Within the last year or— A. Yes; within the last year.''

Dr. J. H. Hicks said that he did not treat Thomas during his life, but was called in when he died. "Q. What was the cause of the death? A. Acute indigestion. Q. Was it complicated with any other disease, acute or chronic? A. Not that I know of."

Dr. J. M. Berry testified that he examined Thomas when he applied for the insurance; that he asked him all the questions in the application and wrote down the answers that Thomas made; that there was nothing in his personal appearance that would indicate that he was suffering from any form of disease or indigestion; that he appeared to be in fine health, and in making out the application and reporting to the Woodmen, he relied entirely upon the answers made by Thomas in his application; that he was called to his house the day he died, shortly afterwards, and from information gathered from the family, his conclusion was that his death was caused from acute indigestion. Asked: "Q. Is indigestion material to the risk in an insurance application on a man's life? A. Well, I don't know, sir, that it is; I can't say that it is. Q. Assuming that Mr. Thomas had reported to you, at the time you secured this personal history from him that he had spells of indigestion at various times? A. I would have stated on the application blank, to let the company—the chief physician—pass upon it; because people sometimes suffer from very slight indigestion, from overeating. Q. Did you or not have anything to do with the acceptance or rejection of this application for insurance? A. No, sir. Q. If Mr. Thomas, in making to you this personal history, had said to you in the course of that history that he had indigestion, would you in that event have inquired as to the number of spells he had, as to whether or not they were light or serious? A. Yes, sir. Q. Would you have made a complete and detailed inquiry into his condition? A. Certainly I would. Q. If in answer to this question, Doctor, 'Have you consulted or been attended by a physician for any disease or injury during the past five years,' had Mr. Thomas answered that question, 'Yes,' would you have gone into detail and made inquiry? A. Certainly, I would have wanted to know what it was he had suffering with and had a physician for, and the doctor, and how long the spell lasted, and how many days he was

sick, so the chief physician could have formed a diagnosis. Q. As I understand the term, 'indigestion' is rather a lay term—that is, a term used by those who are not members of the medical profession—and it is rather a general expression covering a number of things that might or might not be diseases? A. Yes, sir. Q. What did you report in that proof of death as the cause of death? A. Acute indigestion. Q. Upon what information did you make up this death certificate? A. By seeing him there in bed, and my casual examination, and what the parties in there said. Q. Who were the parties? A. I can't call their names, I don't remember, there were several up there. His wife was there."

Dr. Charles A. Edelen testified that he was a medical examiner for several insurance companies. "Q. Are you acquainted with the character of risk ordinarily assumed by the companies in the usual course of their business for life insurance? A. I am." He was then asked and made these answers: "Q. In the usual course of business in all insurance companies, would or not the insurance company accept a risk, a person who had prior to that application for insurance, suffered from acute indigestion, gastritis or disease of the digestive system? A. Any physician would hardly accept any application or recommend any application for insurance who had frequent attacks of acute indigestion or gall stone colic—which is mostly the case in those conditions, that is a gall stone colic. No physician would recommend an applicant of that kind for insurance in any of the old line companies. They might do this; they might put it up to the company which would in all cases be declined or referred back to the medical examiner; and in cases of gall stone colic, should the gall stone be removed, afterwards, they might be recommended for life insurance, but under no circumstances would we accept a man who had frequent attacks of gall stone colic or bilious attacks or acute indigestion they call it. Q. In the usual course of business, what would a company do if an applicant simply stated that he had some indigestion? A. If the applicant would say to the medical examiner that he has a slight case of indigestion, the examiner would recommend him to the insurance company, the insurance company would then take it up with the medical exam-

iner, and have him make thorough examination and find out to his own satisfaction that it was not gall stone colic. Q. Assuming that this applicant had had about three months prior to his application for insurance a very severe attack of indigestion, and just prior to that time, something like six months, had had an attack of gastritis, what would have been the policy of the company in a case of that sort, assuming that the applicant stated that in his application for insurance? A. He would have been declined.''

Dr. F. W. Samuels, who was examiner for several insurance companies, was asked:

''Q. Please state whether or not you consider diseases of the digestive organs, including indigestion, or acute attacks of indigestion, or colic, material to the risk? A. I do. Q. In the usual course of business, would an insurance company accept as a risk an applicant who had had an acute attack of indigestion, a month or two, or perhaps a shorter time prior to the making of his application for insurance? A. An attack of acute indigestion would not make one an unfit applicant for risk because acute indigestion means nothing. Q. Suppose now a man had several attacks and had been suffering from indigestion, what would have been the policy of the insurance company in the usual course of business? A. To defer the risk until it could be found what was the matter with him. Q. Suppose a man made an application for insurance and he stated he had indigestion or acute indigestion or a disease of the digestive organs, what would the company do? A. A disease you know is quite different matter. Acute indigestion is purely a symptom, disease means a different thing. Any disease of the digestive tract would cause him to be at once turned down as far as any regular company is concerned, for good and forever. Q. Suppose a man, in answer to this question, 'Have you now or ever had any disease of the following named organs, or any of the following named diseases, or symptoms, colic, or gall stone, indigestion or other disease of the digestive system,' had answered 'Yes?' A. Then he would be turned down or deferred indefinitely. Q. In the usual course of business, what would insurance companies do with such an applicant? A. They are declined as a rule at the home

office, even though the examiner here should recommend them they would take no stock in his statement whatever, just decline him, at least those I have anything to do with would. Q. Would any information of the insurance company to the effect that a person had had an attack of acute indigestion, have caused the company to make a complete investigation as to the duration and frequency of the attacks before issuing a policy? A. Certainly it would; they would hold as suspicious all those things such as symptoms you have enumerated. As I say they would hold the case suspicious until his condition is proven innocent and not malignant. Q. Would your insurance company consider those diseases as material as any other disease the person might have? A. Colic is not disease you know, it is only a symptom.''

Dr. M. Phelps testified that he knew Mr. Thomas, who told him about two weeks before he died of having a bad attack of indigestion the night before. ''Q. Did he tell you it was indigestion from which he was suffering? A. Yes, sir. Q. Is indigestion a fatal disease? A. Well, not necessarily, until it is an acute attack. Q. Are you an examiner for any insurance company? A. Yes, sir. Q. If a person states in his application for insurance that he has been suffering from indigestion, or a disease of the digestive system, what is the usual and ordinary course taken by a physician in reporting on such applicants? A. Well, if there is any gastritis or dyspepsia to amount to anything, I think he would be turned down. Q. As a matter of fact, gastritis is a disease, is it not? A. Surely, yes. Q. Now, indigestion is not a disease, is it? A. Gastritis and indigestion is the same thing.''

Mrs. Susie Thomas said that Mr. Thomas was only sick about an hour before he died; that a few days before he had a similar attack; that his health had been generally good, except that he was sick in 1912, when Dr. Berry waited on him. Other witnesses testified to the same effect as Mrs. Thomas concerning the general good health of Thomas.

This evidence shows beyond question that Mr. Thomas for three or four years before his death had been suffering with severe spells of indigestion, some of them so serious as to leave him apprehensive that they

would result in his death; and it is also very clear that he knew that these attacks were caused from indigestion or some serious disorder of the digestive system.

We say this because Thomas was an intelligent, well informed man, who had been selling for several years a patent medicine that he was in the habit of using to obtain relief from the attacks he suffered with. It is also undisputed that within five years before his death he had been treated by a physician for gastritis, which is a form of indigestion, and was advised by him of the nature of his ailment.

The evidence that Mr. Thomas knew that the attacks he suffered with were caused by indigestion is conclusive, but it is earnestly insisted that he did not recognize his ailment as a disease and never considered that his digestive organs were diseased; and, this being so, the answers made by Thomas to the questions before referred to were not false.

Much emphasis is put upon the fact that in these questions he was asked if he now or ever had "any disease" or "diseases," such as indigestion or any other "disease of the digestive system;" that the question as to whether he had been attended by a physician also contained the word "disease;" that accordingly it must be made to appear, in order to defeat the recovery on the policy on the ground that these answers were false, that Thomas had a "disease" or a "diseased" condition of the digestive system.

It will be observed, however, that the first question is not confined to "diseases," but includes "symptoms," the question being had he ever had any of the following named "diseases" or "symptoms," and it cannot be doubted that Thomas, even if it could be said that he did not know that the indigestion from which he suffered was a "disease," must have known that he had "symptoms" sufficient to satisfy any person of reasonable intelligence that he had either diseases or symptoms of indigestion.

It is further argued that the evidence shows—and it does—that indigestion is a common ailment and one that a large majority of people are subject to; that it is not regarded as a disease by people generally, but merely as a disordered condition of the stomach, due to some indiscretion in eating food that does not agree

with the person; and if Thomas had only occasional attacks of mild indigestion, or these attacks only caused the slight indisposition that usually comes from indigestion, as commonly understood, there would be great force in the argument of counsel that he never had any diseased condition of the digestive system within the fair meaning of the question to which he answered "no."

But the evidence shows conclusively that Mr. Thomas, for three or four years before his death, had frequently suffered greatly from these. attacks; that some of them were so serious as to cause him to fear that he might not survive another attack. It is, therefore, made plain that the indigestion that he was subject to was not that harmless type that is so common; it was of an aggravated, dangerous form and Mr. Thomas being, as the evidence shows, a man of intelligence must have known the serious nature of these attacks.

There is also ample evidence in the record that if in his application he had answered correctly the question propounded as to his health and that he had been treated by a physician within five years and that he was subject to these attacks about which he so freely spoke to other people, the company would have made a thorough investigation for the purpose of determining whether it would be advisable to accept his application. And the evidence of the medical examiners permitted to go to the jury, as well as that improperly excluded, also makes it very clear that if the company had been put in possession of this information by the answers of Thomas in his application, it would either have rejected him at once or have made a thorough investigation and, if the facts developed the conditions that appear in this record, would have rejected his application.

It is provided in section 639, of the Kentucky Statutes, that: "All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties; nor shall any misrepresentations, unless material or fraudulent, prevent a recovery on the policy;" and under this statute it has been frequently written that false answers in an application will not avoid the policy contract unless they are material or fraudulent. Giving to this statute its fair meaning and the construction that has been con-

sistently applied, there seems, in the light of the evidence, no escape from the conclusion that the answers of Thomas, in his application, were material and false.

Counsel for Mrs. Thomas rely on the cases of U. S. Casualty Company v. Campbell, 148 Ky. 554; Columbia Life Insurance Co. v. Tousey, 152 Ky. 447; Yeoman of America v. Rott, 145 Ky. 604; National Protective Legion v. Allphin, 141 Ky. 777, as supporting the contention that the answers of Thomas were not so false or material as to affect the validity of the insurance contract, but the facts in these cases, and many others like them, are so different from the facts in this case that they cannot be regarded as controlling authority on the propositions asserted by counsel.

On the contrary, this court, in many cases, has consistently held under facts, such as appear in this record, that there could be no recovery on the contract. Provident Savings Life Assurance Co. v. Dees, 120 Ky. 285; Provident Savings Life Assurance Company v. Whayne's Admr., 131 Ky. 84; Illinois Life Insurance Co. v. DeLong, 124 Ky. 569; Metropolitan Life Insurance Co. v. Schmidt, 29 Ky. Law Rep. 255; Brisou v. Metropolitan Life Insurance Co., 115 S. W. 785; Supreme Lodge of Knights of Pythias v. Bradley, 141 Ky. 334; Blenke v. Citizens Life Insurance Company, 145 Ky. 332; Knights of Maccabees v. Shields, 156 Ky. 270; Royal Neighbors of America v. Spore, 160 Ky. 527.

Upon the whole case, after a very thorough consideration we have reached the conclusion that the verdict of the jury was flagrantly against the evidence and contrary to the instructions of the court. We are also of the opinion that on another trial, the court should permit all the evidence offered by the company tending to show that according to the usual course of life insurance business, the application would not have been accepted or the policy issued if the truth had been stated in the answer or answers made by the insured, and if upon another trial the evidence is substantially the same as appears in this record, the court should direct the jury to return a verdict for the defendant.

Wherefore, the judgment is reversed with directions for a new trial not inconsistent with this opinion.