CASE 9.—ACTION BY R. C. WHAYNE'S ADMINISTRATOR AGAINST THE PROVIDENT SAVINGS LIFE ASSURANCE SOCIETY OF NEW YORK FOR THE COMMUTED VALUE OF SIX POLICIES OF INSURANCE OF $20,000 EACH.—January 1, 1906.

## Provident Savings Life Assur. So. v. Whayne's Admr.

Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

THOS. R. GORDON, Judge.

Judgment for plaintiff. Defendant appeals—Reversed.

1. Insurance—Warranties—Statutory Provisions.—Provisions in a life policy that representations in the application are warranties are void, being in violation of Ky. Stats. 1903, section 639, providing that all statements in any application for insurance shall be deemed representations and not warranties, and no misrepresentation, unless material or fraudulent, shall prevent a recovery on the policy.

2. Same—Misrepresentations—Materiality.—Misrepresentations in an application for insurance are material if they effect the risk, whether they relate to the actual cause of loss or not.

3. Same—Questions of Law or Fact.—Whether representations in

Provident Savings Life Assur. So. v. Whayne's Admr.

an application for insurance are material to the contract and whether they are materially untrue are questions of fact, though the former is also one of law.

4. Same—Instruction.—In an action on life policies, an instruction that if answers by assured in his application were untrue, and if true answers had been given, the insurer, acting naturally and reasonably, would not have entered into the contract, should have been modified by adding, after "naturally and reasonably," the words "in accordance with the practice usual among life insurance companies."

5 Same.—In an action on life policies, defended on the ground of false answers in the application therefor, an instruction stating questions in the application and submitting the question whether the answers were materially untrue should have stated what the answers were; that being admitted by the pleading.

6. Same.—In an action on life policies, an instruction authorizing a recovery by plaintiff on all of them, if on any, was erroneous, where the evidence would have justified a recovery o¨ one set of policies, but not on another.

7. Same—Repayment of Premiums—Tender—Necessity.—In an action on life policies, it is not necessary that the insurer, to maintain the defense of fraud, should tender back the premiums paid.

8. Same—Knowledge of Insurer—Evidence.—In an action on life policies, defended on the ground of misrepresentations by the assured, evidence of the existence of an association of life insurance companies for the exchange of information relating to applicants, being offered to show that the defendant knew the truth as to the matters misrepresented, the assured having been rejected by other companies, was inadmissible, where it was not shown that the companies by which he was rejected were members of the association.

9. Evidence—Hearsay.—Testimony that there was an association of life insurance companies for the exchange of information as to applicants, and that the witness, an insurance agent, had been informed by circular letter from his company of its existence, was inadmissible as hearsay.

10. Same—Memorandum—Self-Serving Declaration.—In an action on life policies, defended on the ground of misrepresentations as to prior insurance, a memorandum of the insured not made in a book of account in the course of his business, introduced to show that he was innocently mistaken as to the amount, was inadmissible, being a self-serving declaration.

11. Insurance—Suicide by Insured—Evidence.—In an action on

life policies, evidence that the insured, shortly before his death, frequently spoke hopefully of his prospects in business, was relevant on the question whether he committed suicide.

12.    Same—Misrepresentations—Previous Rejections—Evidence.— In an action on life policies, defended on the ground of misrepresentations by the assured as to rejections by other companies, evidence that he had been rejected by one company because the medical director regarded the application with disfavor because the agent was not the regular agent of the company, was admissible, as tending to show the insured's belief as to whether he had been rejected in good faith.

13.    Same.—In an action on life policies, where the court admits any evidence as to whether there are drugs which will temporarily remove a trace of sugar in the urine, it should admit all evidence offered on both sides on the subject.

W. T. GILBERT, ALEX. P. HUMPHREY, THOS. W. BULLITT and WM. MARSHALL BULLITT for appellant.

O'NEAL & O'NEAL and HELM, BRUCE & HELM for appellee.

(No briefs—Record out of office.)

OPINION OF THE COURT BY CHIEF JUSTICE O'REAR— Reversing.

The judgment appealed from in this case was rendered upon the verdict of a jury, and was for $74,286, the commuted value of six policies of insurance for $20,000 each issued by appellant upon the life of Robert C. Whayne. The policies were issued in two sets of three policies each. The first lot was applied for on January 10, 1902, and the policies were issued January 17, 1902. The second was applied for February 10, 1902, and the policies were issued March 7, 1902. A formal written application, in which numerous questions were asked of the insured and answered by him, and a careful medical examination by the company's local medical examiner, were in part the basis of the issual of the first set of policies. The applica-

tion for the second set was also signed by the appellant, containing like questions and answers in writing; but no new medical examination of the applicant was made. Instead, a health certificate, signed by the applicant, was given. The policies were upon what is called the "installment and principal" plan, which was, instead of paying the face of the policies at the death of the assured, they were to be paid in annual installments extending through a period of 20 years, with the option to the beneficiary to commute the value into a single payment at the death of the assured. Whayne, the assured, died as the result of a gunshot wound inflicted December 17, 1902. In this suit by his administrator upon the policies there were a number of defenses interposed. None of them are involved on this appeal, except the following: It is asserted that the assured made false, fraudulent, and material misrepresentations in his application for this insurance, which induced appellant to issue the policies, in the following particulars: (1) As to his prior rejections by other companies; (2) as to his health; and (3) as to his last previous illness and the attending physician thereat. The reply of appellee put in issue, and there was considerable proof introduced at the trial concerning whether the assured had made false and fraudulent misrepresentations with respect to the various matters alleged by way of defense in the answer. Whether they were false and fraudulent, or whether the misrepresentations were material, in so far as those questions are in issue, the court refrains from expressing an opinion upon, in the way of determining the fact, further than such fact may also be the law.

The application which is signed by R. C. Whayne and attached to the policy provides:

"Part I. I hereby warrant on behalf of myself and of any person who shall have or claim any interest in any policy issued under this application, that all the statements and answers contained in part I and II of this application, by whomsoever they may be written, are material to the risk, and are full true and complete. I hereby agree on behalf of myself and of any person who shall have or claim any interest in any policy issued under this application, as follows: * * * That if at any time any warranty made in this application, or any of the foregoing agreements, shall be violated, said assurance shall be null and void, etc.

"Part II. I hereby declare that I have read and understand all the above questions and the answers thereto, and they are hereby made part of my said application for assurance by the Provident Savings Life Assurance Society of New York, and I hereby warrant said answers, as written, to be true and that I am the person described above and in part I of this application signed by me."

The policy provides that: "This assurance is granted in consideration of the statement and agreements in the written and printed application for this policy, which is hereby made a part of this contract."

The application contains the following questions and answers: "Part I. (23) Has application to grant or restore assurance on your life ever been made which was not complied with in the form and amount asked for? If so, state every such case, when, and the cause or causes? Answer. No." "Part II. (11) Has any life assurance organization ever postponed, rejected or limited as to amount, form or premium, your application for assurance? (Full particulars required.) Answer. No." The defense is that Whayne's answer "No" was false, and was a material and fraud-

ulent misrepresentation, because, it is alleged, Whayne had theretofore been rejected or postponed for life insurance by each of the following companies: Mutual Life of Kentucky, in December, 1897; the Equitable Life Assurance Society, in June, 1899; and the United States Life, in December, 1901.

The application also contained the following: "Part II. (9) When, and by what physician, were you last attended, and for what complaint?" To which Whayne answered: "Dr. R. B. Gilbert, 1898; for rheumatism." The defense is that after 1898, to-wit, during 1899, 1900, and 1901, Whayne was treated by various physicians for various different complaints.

The application contains the following question: "Part II. (4) Have you now, or have you ever had, any of the following? Answer 'Yes' or 'No' to each. If 'Yes,' give particulars under 7 below. Diabetes? 'No.' Disease of skin? 'No.' Rheumatism? 'Yes.' Any serious disease, injury, or infirmity other than listed above? Answer 'Yes' or 'No.' If 'Yes' give full details in 7." Whayne answered "No" to all the questions, except as to rheumatism, and with respect to that he answered as follows: "(7) Clinical History. Describe briefly the history of any affection experienced by applicant, as per his answers in 4. Affection. Date. Duration. Severity. Results. Physician. Rheumatism, 1898. 3 weeks. Mild. Recovery. R. B. Gilbert. The attack was a mild one, the patient not being confined to the bed, or even to the house. The stroke was only in one ankle and after three weeks disappeared completely, and left no ill effects." The defense is that Whayne had (1) a skin disease (eczema), (2) diabetes (as evidenced by sugar in his urine), and (3) instead of a mild attack of rheumatism it was a very severe attack, lasting much longer than

three weeks and that it extended far beyond the ankle, and had reappeared during subsequent years.

There was also a defense of death by suicide, which cause was excepted from the insurer's liability in the policy. But it is conceded by appellant that that issue was properly submitted.

The main questions for decision are: First. The effect of the misrepresentations alleged, if they are, in fact, misrepresentations; whether they are material, and, in this connection, whether their materiality relates to the risk or the loss. Second. Whether the materially of the misrepresentations is a matter of law, to be decided by the court, the facts to be found by the jury, or whether it is a question altogether for the jury to decide. There are other questions of practice in addition to the above, which will be noticed in place.

The first two formulated will be treated together. Wherein the policies and applications declared that the representations are warranties, they are in conflict with the statute of this State. Indeed, such provisions are now very generally reduced by statute from warranties to representations. The statute of this State on that subject reads (section 639, Ky. Stats., 1903): "All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties; nor shall any misrepresentations, unless material or fraudulent, prevent a recovery on the policy." At the common law any misrepresentation of fact, contrary to the warranty contained in the contract, avoided the policy. It was to alleviate the rigor of a rule which applied with unjust harshness in very many cases that the statute was enacted. It was never intended, though, that deception and fraud, whereby a contract

of insurance might be induced, should, after the contract had been entered into, be beyond the corrective power of the courts, or that this class of contracts should form an exception to the safe rule that fraud practiced by a successful party in the obtention of a contract will vitiate it. The Legislature intended to prevent oppression by relieving against immaterial matters, which did not influence, and in no reasonable probability could have influenced, the parties to enter into the agreement. It was never intended that either party could be bound except by a meeting of their minds upon matters material to the contract. As to the liability of the insurer upon the contract, after it had become effective as such, the statute does not attempt to touch upon, further than to reduce warranties into mere representations. As to the effect of either party's material misrepresentations, upon the other's liability upon the agreement, the statute left them where the common law places them—which is, if either party by fraud induces the other to engage himself in an undertaking, it is void at the option of the latter; or if, by misrepresentation of any fact material to the subject-matter of the contract, whereby it is induced, and but for which it would not, or probably would not, have been entered into, it, though innocent in intent, nevertheless operates as a surprise upon the other party who has been misled by it, and is equivalent to a fraud in law, or constructive fraud, so far as releasing the person imposed upon by it is concerned. If the person who made the misrepresentation was honestly mistaken in the statement when he made it, and therefore was not guilty of fraud, he would be no longer honestly mistaken after he has discovered the truth, if he then tries to hold on to an advantage so obtained, and to get the full benefit of

the deceit that has been worked upon his adversary.

Nor is it material whether the misrepresentation caused the loss or not. The inquiry is not directed necessarily to that fact. But it is whether the fact misrepresented is material to the contract—in insurance, is material to the risk imposed by the contract. If the insurer was never bound, because overreached by the positive fraud of the insured in the obtention of the contract, it must be obvious that the cause of the loss is not material. The insurer has the right to know certain facts relevant to the risk he is asked to assume, so that he can determine in his own mind whether he will, for the consideration paid, undertake them. To deceive him into believing one thing, which is material to the risk, by fraudulent misrepresentation, or by misrepresentation at all, is to bind one in a voluntary contract against his will and contrary to his express agreement. It would ignore a very important part of the consideration upon which the contract rested. In life insurance, it may well be supposed that it is material to the risk whether the insured has ever had or ever been treated for rheumatism sciatica, eczema, or diabetes. It is not possible, even in the presence of many symptoms for even expert medical men to diagnose one's condition. It is even less certain what the result of the disease which the symptoms represent may be. But if the symptoms are not present, appearances are most apt to deceive the examiner, although disease may undoubtedly be present in a latent form. If, however, shortly or frequently before the date of the application and examination, the person had been ill of certain diseases, and had been treated therefor by physicians, the fact of such illness, its duration and history, might shed light upon his present condition.

They are all, at least, relevant matters, which may certainly interest the prospective insurer as bearing upon the advisability of taking the risk offered. For the same reason, in part, the action of other insurance companies of whom the applicant had sought insurance, in rejecting his application for cause, is a pertinent fact bearing on the advisability of writing the risk. It may not at all follow that because a man has been ill, but apparently fully recovered, and that he had been rejected by other insurance companies for cause, but the cause is found to have been removed, or shown to have probably been a mistake, that every other insurance company to whom he may subsequently apply would reject him also, even if it knew all the facts. Still, these are all matters that may be material depending on the obstinacy of the disease, how recently it had appeared, and whether the causes of other rejections were well founded. It was a proper and pertinent inquiry whether the applicant had other insurance on his life, and how much. Although he may not commit suicide—at least, it might be impossible to prove it if he did—it is always a proper inquiry whether the assured is probably able to carry his insurance. The insurance company insures him expecting both that he will probably live out his expectancy, and will probably retain his relations to the company as a paying policy holder. Its premiums are based, it may be fairly supposed, in part on that expectation. If, then it knows he is unable to pay more than the first premium, his contract would be very undesirable from the point of view of good business. Furthermore, if one is heavily insured far beyond anything he could hope to realize by living out his full expectancy, there is less inducement to care to preserve his life in emergencies; there is

greater incentive to extreme carelessness, increasing the hazard of his insurer. All these matters were material to the risk in the sense that they had a pertinent bearing on it, and, according to the circumstances, might or might not have reasonably resulted in a different action by the insurer, had they been fully known when the contract was entered into. They are matters the insurer has a right to be informed of. As it acts upon the information given it, and which is sought for that purpose, it must follow that, if the information is concerning a matter material to the risk, and is substantially not true, the insurer ought not to be bound upon it. Providence Savings Life Ins. Co. v. Dees, 86 S. W. 522, 27 Ky. Law Rep. 670; Union Central Life Ins. Co. v. Lee, 47 S. W. 614, 20 Ky. Law Rep. 839; Mutual Life Ins. Co. v. Thomson, 94 Ky. 23, 22 S. W. 87, 14 Ky. Law Rep. 800; American Aid Society v. Bronger, 12 Ky. Law Rep. 284, 91 Ky. 406.

How is the materiality of the misrepresentation to be determined? In some cases the parties have attempted by the policy to make certain statements material (Farmers' & Drovers' Ins. Co. v. Curry, 13 Bush, 312, 26 Am. Rep. 194, overruled by Germania Ins. Co. v. Rudwig, 3 Ky. L. R. 712, 80 Ky. 235), but this is open to the very vice aimed at by our statute (sec. 639, supra). It is material or not, according as it may affect the merit of the matter; and that is not a thing which the parties can in advance settle by convention. In Penn. Mutual Life Ins. Co. v. Mechanics' Savings Bank, 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33, opinion by Taft, J., this rule is laid down for determining the matter: "A fair test of the materiality of a fact is found in the answer to the question whether reasonably careful and intelligent men

would have regarded the fact, communicated at the time of affecting the insurance, as substantially increasing the chances of the loss insured against. The best evidence of this is to be found in the usage and practice of insurance companies in regard to raising the rates or rejecting the risk on becoming aware of the fact. If the rates are not raised in such a case, it may be inferred that reasonably careful men do not regard the fact as material. If the rates are raised, or the risk is rejected, then they do." We think the question is generally one for the jury. It is not a case of the construction of a writing, as to what a written instrument means, but it is the ascertainment of a fact, upon the existence of which the writing is avoided. In defense of liability on the writing it is alleged that a certain statement contained therein, which in part induced its execution, is material to the contract, and was materially untrue. Both propositions asserted are questions of fact, though the first is also a question of law. Whether it was material to the contract, as we have seen, depends on whether prudent men of ordinary judgment engaged in the same business would, if it had been disclosed to them, have either raised the price, or rejected the risk. The rulings of the circuit court at the trials were in substantial accord with these views. In Provident Savings Life Ins. Co. v. Dees, supra, it seems to have been assumed that the question of materiality was for the court. But the question was not discussed in the opinion and was not passed upon at all. In all other respects the rule laid down in the Dees Case as construing the statute is expressly approved.

The trial court gave these instructions to the jury:
"(1) If you believe from the evidence that the

deceased, Robert C. Whayne, committed suicide, whether sane or insane at the time thereof, you will find for the defendant.

"(2) The deceased, Robert C. Whayne, in the application for the policies of insurance sued on in this case, was asked and answered the following questions: (a) 'Has application to grant or restore assurance on your life ever been made which was not complied with in the form and amount asked for? If so, state every such case, when and the cause or causes.' 'Has any life insurance organization ever postponed, rejected, or limited as to amount, form or premium, your application for insurance?' (b) 'Have you now, or have you ever had, any of the following diseases? Answered "Yes" or "No" to each. If "Yes," give particulars. Diabetes? Disease of skin? Sciatica?' (c) 'Have you now, or have you ever had any of the following? Answer "Yes" or "No" to each. If "Yes," give particulars. Rheumatism? Describe briefly the history of any affection experienced by the applicant as per his answer to said last question.' (d) 'When and by what physician were you last attended and for what complaint?' If you believe from the evidence that the answers given to said questions, or any of them, or the particulars given, or descriptions made in response thereto, or any of them, were, without the knowledge of defendant insurance company, untrue in any particular, in which true answers would have stated facts or conditions which were reasonably and ordinarily calculated to shorten the life or increase the probability of the death of said Whayne, or which, if known to defendant insurance company, it, acting naturally and reasonably, would not have entered into the policy contracts upon the terms and the annual stipulated premiums, as shown

in the policies sued on, the law is for the defendant, and you should so find.

"(3) If you believe from the evidence that the answers given by the applicant, Robert C. Whayne, to the questions set out in instruction No. 2, or any of them, or the particulars given or descriptions made thereunder, or any of them, were untrue, and were known by said Whayne, at the time of making the application or the receipt of the policies, to be untrue, and were made by him for the purpose of deceiving the defendant insurance company and procuring the policies thereby, and the defendant insurance company was deceived into issuing said policies by such untrue statement or statements, which were known to said Whayne to be untrue, and not known by it to be untrue, the law is for the defendant, and the jury should so find.

"(4) Unless you believe from the evidence that the deceased, Robert C. Whayne, committed suicide, whether sane or insane at the time thereof, the law is for the plaintiff, and you should so find, unless you should find for the defendant under instructions Nos. 2 and 3.

"(3) If you find for the plaintiff, your verdict should be for the plaintiff for the sum of seventy-four thousand, two hundred and eighty-six dollars, (74,-286), with interest at the rate of 6 per cent. per annum, from the 17th of February, 1903, until paid. If you find for the defendant, you will say so by your verdict, and no more."

The instructions were objected to by appellant on the ground that they not only submitted things to the jury which the court ought to have found (i. e., the materially of the representations above discussed), but gave the wrong standard by which the jury might

determine the materiality of the statements. The contention is that it ought not to be left to the jury to say whether the insurer ought to have accepted the applications, even though it had then learned the truth as to the applicant's previous condition of health and the action of other companies in rejecting him and the amount of insurance he was then carrying. It is argued that this is to take away from the insurer the exercise of its own judgment in selecting its risks, and substituting the judgment of untrained men; that at least there ought to have been added in instruction No. 2, after the words "naturally and reasonably," the words "in accordance with the practice usual among life insurance companies." This criticism seems to us to be well founded. The question was not what ought the insurance company to have done, had it known the truth concerning the facts misrepresented, but what it probably would have done. That was to be determined not by what it might say afterward about it—for, manifestly, that would be a very unsafe standard—but by what was the usual course of those engaged in such business under similar circumstances. The jury must determine the matter not from their own standard, but from the practice of those engaged in that business. They should put themselves in the place, as it were, of the insurer as of the time when the applications came to be acted upon, and assuming that all the facts were then known, to determine the probable course of the insurance company by the course generally pursued by those whose habit and business experience generally impelled them to a particular action under such circumstances. Instruction No. 2 is, furthermore, objectionable in that it fails to give the answers to the questions propounded to, and answered by the appli-

cant. The answers were admitted. They formed a part of the application as certainly as the questions did. Appellant should not have been left under the burden of proving a necessary part of its case, which was admitted by the pleadings of its adversary. The fifth instruction is objectionable because it grouped all the policies into one sum, and compelled the jury to find the whole sum for appellee, if it found for it at all. The policies were not only applied for and issued in two sets, as has been stated, but the evidence was such that the jury might have found on one set for appellee, and on the other for appellant.

It was contended below by appellee, and is here, that appellant could not maintain its defense unless it tendered back the premiums it had received upon the contracts sued on. We do not decide who was entitled to the premiums, in event it should turn out that appellant was not bound on the contracts. That question is not presented. But it must be borne in mind that appellant was not suing for a rescission of the contracts. It had been sued upon them. It could defend by showing that the contract was procured by fraud, or by misrepresentation, or was void for other reasons. A right of action for rescission or specific performance may depend upon a previous tender. But a defense that merely goes to the question whether the contract was void because of fraud practiced in its obtention does not depend on a tender by the defendant of what it may have received under the contract.

Several rulings on the admission or rejection of evidence are complained of by appellant.

First. It was attempted to be shown by appellee that appellant, notwithstanding the misrepresentations of the applicant, knew the truth about the mat-

ters.  Of course, if it did, it could not have been imposed upon by them, and they would become thereby immaterial in the case.  It was attempted by appellee to show this fact by proof that there was an exchange of information among all life insurance companies on this subject; that they maintained a central bureau of information, to which all reported all applications and rejections, which in turn communicated the facts to all the constituent companies.  There was no evidence that either the Mutual Life of Kentucky, the Equitable or the United States Life ever belonged to such an association, or ever reported anything to it. The testimony of Mr. Stevens, appellant's secretary, leaves an impression that there may have been some such manner of disseminating such information among insurance companies.  Still there was no evidence whatever, direct or otherwise, that the companies who are shown to have rejected or suspended Whayne's applications were members of the organization.  Notwithstanding, a witness for appellee, H. P. Reagor, was permitted to testify on this point as follows: he had been an insurance agent at Louisville for different life insurance companies through a number of years: "Q.  Do you know whether or not there is any association or bureau of life insurance companies by which they systematically exchange information to each other on the subject of former rejections or postponements of risks?  A. I do.  Q. What is it, and how does it operate?  The Court: The question is whether or not there is an association of insurance companies by which information in regard to the rejection of applications is interchanged or exchanged between the companies.  Is there such an association? A. Yes, sir.  By Mr. Bruce: Did it exist in 1902? A. Yes, sir.  Q. How does it operate?  A. If any

application is sent to the home office of my company before the board of directors and the medical examiner has passed on it— Answer objected to by the defendant. The Court: Is there an association of the Germania by itself? A. My understanding is, all companies. Q. How is this information exchanged between the companies? Explain how it is done? A. Well, I know from my own experience, having placed business through perhaps as many as five companies in my time, that if there was a rejection, and it was denied by the applicant, that the rejecting company would always inform me of the rejection and the date, withholding the cause for good reasons. Q. Do you know the details of exactly how the exchange of communication is made—in what form? A. Well, I have through a circular letter been informed through my company that such an exchange exists."

It is not pretended that the practice referred to by the witness was, within his knowledge, indulged, in fact, by any company to whom application had been made by Whayne. This testimony, even if in proper form, is not only inclusive, but it is all, or nearly all, hearsay. It does not tend to connect either appellant, or any company to whom the application had been made by Whayne, with the bureau of information, nor does it form a link of any other evidence in the record having that tendency. Its reception was hurtful and erroneous.

Second. Whayne carried a small pocket memorandum book, on one page of which was this entry, in his handwriting:

Insurance in force 1902, R. C. W.:
Northwestern ........................$ 2,000 00
Northwestern ...... ................. 3,000 00

| | |
|---|---|
| New York Life........................ | 5,000 00 |
| Union Central........................ | 10,000 00 |
| 3 Equitable........................ | 150,000 00 |
| 2 Provident Savings.................. | 60,000 00 |

| | |
|---|---|
| March 20 ........................ | $230,000 00 |
| January 1, Equitable.................. | 50,000 00 |

$280,000 00

As one of the issues in the case was Whayne's alleged fraud in obtaining his insurance, any false statements of his, to any insurance company at or about the same time, in obtaining other insurance, was relevant as tending to prove a general plan to defraud the insurance companies, which would, of course, include the appellant. First National Bank v. Wisdom, 63 S. W. 461, 23 Ky. Law Rep. 530. The entry above copied was introduced to show that Whayne had himself probably forgotten the true amount of his insurance, and therefore was innocently mistaken in whatever representations he may have made to the insurance companies on the subject. We are of opinion that this entry, being in his own behalf, and not in any sense made by a merchant or trader in his general book of accounts, kept in the course of his business, does not come under any rule of evidence that would admit it as evidence in his behalf. If they are for him, they are self-serving statements, and are no more admissible than any other statement of the transaction written by him in which a favorable impression for himself was made to appear.

Third. There was evidence admitted that Whayne, in numerous conversations with friends and acquaintances shortly before his death, spoke hopefully of his

prospects in business, claiming it was prosperous, and so forth. This evidence, we think, was admissible. One of the issues was suicide. The evidence just mentioned was particularly relevant as bearing on that question. It tended to show the state of mind of the assured at or about the time of his death.

Fourth. We think the testimony of C. W. Dorsey admissible, also. He was the agent who solicited the insurance for the Mutual Life of Kentucky which was rejected, it is alleged, because sugar in the urine was discovered. Dorsey testified that he asked Whayne whether he was in the habit of eating sweets; that Whayne answered that he was, three times a day; that Dorsey then suggested to him to leave off eating sweets for a few days and have the urine tested again; that this was done, and the trace of sugar had then disappeared; that he reported the fact to the medical director of the Mutual Life Insurance Company of Kentucky, and asked for a re-examination of Whayne, but it was declined, and he believed because the medical director regarded the application with suspicion, and disfavor, as Dorsey was not the regular agent of his company but of another; that he, Dorsey, reported all these facts to Whayne. This testimony was competent for this purpose: It tended to show whether Whayne believed that he had not been in good faith rejected by the Mutual Life Insurance Company of Kentucky because of the discovery of sugar in his urine. It bore on the question whether, in his future representations or treatment of that matter in applications to other companies for insurance, he was actuated by a fraudulent or an innocent motive.

Fifth. If the court admits any evidence on the question whether there are drugs which will destroy or temporarily remove the trace of sugar in the urine,

it should admit all the evidence offered on both sides of that subject. Dr. Grant's testimony on that point should not have been excluded from the jury.

The judgment is reversed, and cause remanded for proceedings consistent herewith. All concur, except SETTLE, J., who dissents from so much of the opinion as holds that the misrepresentations are material to the risk, instead of to the loss, in order to avoid the policy. In other respects, he also concurs in the opinion.