WICKLIFFE FARMS, INC., Appellant,

v.

OWENSBORO GRAIN COMPANY, Appellee.

Court of Appeals of Kentucky.

Aug. 24, 1984.

As Modified Oct. 19, 1984.

Discretionary Review Denied by Supreme Court Feb. 21, 1985.

Flem Gordon, Gordon & Gordon, Owensboro, for appellant.

Ronald M. Sullivan, Holbrook, Gary, Wible & Sullivan, P.S.C., Owensboro, for appellee.

Before COOPER, REYNOLDS and DUNN, JJ.

DUNN, Judge.

This is an appeal from a summary judgment in favor of appellee, Owensboro Grain Company, entered in the Daviess Circuit Court September 9, 1982, as amended September 29, 1982. The action arises out of a contract to sell No. 2 white corn and the defense of impossibility of performance resulting from a drought.

The appellant, Wickliffe Farms, Inc., in business since 1971, farms several contiguous farms in Muhlenberg County. Of the approximate 1980 acres it farms, the corporation owns about 250 acres, Reynolds Wickliffe, its president and principal shareholder, owns about 1000 acres, and Reynolds' father's estate, the J.W. Wickliffe Estate, owns 730 acres.

The Corporation had done business with the appellee, Owensboro Grain, since 1975, primarily thru Reynolds Wickliffe, representing the corporation, and Julian G. "Sonny" Hayden, employed by Owensboro Grain as a grain merchandiser.

In February, 1980, Wickliffe contacted Hayden by telephone and they orally agreed that the corporation would deliver 35,000 bushels of No. 2 white corn at $3.70 per bushel to Owensboro Grain between December 15, 1980, and January 31, 1981. The agreement was confirmed in a writing executed by Owensboro Grain and signed by Wickliffe on behalf of the corporation. The agreement, prepared by Owensboro Grain, was on its standard "fill in the blanks" form as to quantity, the grain commodity, the price, the routing, and shipment date. It was dated February 29, 1980, and identified the corporation as the accepting party. It contained no additional language of any significance other than the following part of a small print "force majeure" clause unilaterally favoring Owensboro Grain:

All agreements, undertakings, obligations or liabilities hereunder, made or to be kept and performed by Owensboro Grain Company, are made and shall be kept and performed subject to and contingent upon strikes, embargoes, fires, accidents, war restrictions, acts of God, or other conditions over which Owensboro Grain Company has no control and any inability on its part to keep, perform or satisfy the agreements, undertakings, obligations or liabilities hereunder caused or brought about by reason of any of the foregoing conditions shall, at the option of Owensboro Grain Company, render this contract null and void and the parties hereto shall have no further rights or obligations hereunder...

Owensboro Grain's principal business is dealing in the Chicago Board of Trade market area by purchasing grain for future delivery and by arranging an immediate sale of it to consumers or exporters at a margin of profit the market will competitively allow. In reference to his employer's business generally and to the instant transaction specifically, Hayden testified: "... my orders from the stockholders are to buy it, sell it, or hedge it. In this case you have to sell it because you can't hedge it."

In keeping with this practice, immediately after the contract was executed for Wickliffe to deliver the No. 2 white corn in the future, Owensboro Grain sold the 35,000 bushels, along with white corn similarly purchased from other farmers, to C.B. Fox, an exporter, at a price that guaranteed a 20 to 25 cent profit.

Unfortunately, in the summer of 1980, Muehlenburg County, together with the rest of western Kentucky, suffered a severe drought. Wickliffe's No. 2 white corn crop was severely damaged as were the crops of the other farmers in the area. Consequently, Wickliffe was unable to produce sufficient No. 2 white corn to fulfill its contract. In January, 1981, it delivered its entire crop, 18,718.57 bushels, to Owensboro Grain and was paid the agreed amount of $3.70 per bushel.

As a result of the short delivery, Owensboro Grain was required to purchase the amount of the shortage at $5.54 per bushel, the then market price, to satisfy its obligation to C.B. Fox entered into as a result of its futures contract with Wickliffe. The

total amount spent to make up the bushels' deficit was $29,306.57. This amount was not withheld as a "set off" when it paid Wickliffe for the corn it managed to deliver, but $19,157.07 was withheld from amounts owed Wickliffe for purchase of corn and soybeans in January and February, 1982, by Owensboro Grain.

Wickliffe sued Owensboro Grain in the Daviess Circuit Court for the amount of the sale of the corn and soybeans. Owensboro Grain counterclaimed for its loss resulting from the partial non-delivery of No. 2 white corn in 1981. The trial court entered summary judgment in favor of Owensboro Grain on its counterclaim, later amended to include interest.

On appeal, as well as in the trial court, Wickliffe primarily relies on the defense of impossibility of performance caused by the severe drought, a "force majeure." We agree with the trial court that this defense is not applicable since the contract did not specify the land on which the corn was to be grown. Hence, we affirm.

There is no disagreement that the provisions of § 2–615 of the Uniform Commercial Code (U.C.C.) (1978), adopted as KRS 355.2–615, address the issue before us; also, there is no disagreement that there is no Kentucky law interpreting KRS 355.2–615, particularly with reference to U.C.C. § 2–615 comment 9 (1978), which in pertinent part is as follows:

> The case of a farmer who has contracted to sell crops *to be grown on designated land* may be regarded as falling within ... this section, and he may be excused, when there is a failure of the specific crop....

We have carefully considered Wickliffe's argument that the contract was one-sided or unconscionable because it contained no specific "force majeure" clause in its favor as it did in favor of Owensboro Grain and conclude the argument is without merit. We reach a like conclusion on Wickliffe's position that an "adhesion contract" resulted from the "fill in the blanks" form of the contract.

Wickliffe's principal argument is that the defense of impossibility provided by KRS 355.2–615 should be available to it due to the fact that it was contemplated by both parties that the No. 2 white corn was to be grown on its 2000 contiguous acres in Muhlenburg County and, that the adverse weather of the 1980 summer was a condition that was unforeseen and unforeseeable by the parties, and which rendered Wickliffe's performance impossible, and, pursuant to the statute, thereby excused his obligation to fully perform.

Nowhere. in the contract, however, is there any reference to any specific acreage upon which the crop was to be grown. Wickliffe urges that KRS 355.2–202 permits contradiction of the written terms of the parties' intention by admission of proof of a contemporaneous oral agreement. This statute provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (KRS 355.1–205) or by course of performance (KRS 355.2–208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

This argument ignores the fact that to be admissible, the proof must come within the provisions of subparagraph (b) of the statute that requires the parol evidence be of additional terms consistent with the written contract. Here there is no consistency between Wickliffe's claim that the corn was to be produced off a particular part of a 2000 acre farm and a contract providing for nothing other than buying and selling 35,000 bushels of No. 2 white corn. There was no proof before the trial court, parol or

otherwise, offered or proffered by Wickliffe, to establish that both parties contemplated and agreed upon a contract to sell the corn from any particularly designated acreage.

The undisputed admissible material facts before the trial court prove the ordinary "futures contract" of an agreement to buy and sell a quantity of grain at a given price per bushel, to be delivered at a future date, the purchaser thereafter arranging a "back to back" sale of the commodity. The sellers in such a transaction gamble the market price will not be greater at the time of delivery and the buyers gamble that it will not be lower. All Owensboro Grain was interested in was buying 35,000 bushels of No. 2 white corn from Wickliffe at $3.70 per bushel and nothing more. Its business was not to speculate either in the weather, crop yield or fluctuation of market price. It guaranteed its profit by selling immediately. Wickliffe's only interest was to sell it. It chose to contract to deliver the corn at a given price at a given future date and failed to do so.

Since there exists no issue of material fact and Owensboro Grain is entitled to judgment as a matter of law, the trial court committed no error in granting summary judgment on Owensboro Grain's counterclaims. *Shah v. American Synthetic Rubber Corp.*, Ky., 655 S.W.2d 489 (1983).

The Daviess Circuit Court summary judgment and amended summary judgment are AFFIRMED.

All concur.