**Gary E. BISZANTZ, dba Gary E. Biszantz Racing, Plaintiff–Appellant,**

v.

**STEPHENS THOROUGHBREDS, Defendant–Appellee.**

No. 15–5215.

United States Court of Appeals, Sixth Circuit.

Oct. 27, 2015.

BEFORE: GUY, KETHLEDGE, and
STRANCH, Circuit Judges.

OPINION

STRANCH, Circuit Judge.

Gary E. Biszantz contracted with Stephens Thoroughbreds for the sale of a racehorse. Biszantz alleges that Stephens breached several provisions of the contract, as well as an express warranty created outside of the contract's written provisions. Biszantz further alleges that Stephens committed fraud through affirmative misrepresentations and omissions. The district court granted summary judgment to Stephens. We AFFIRM.

## I. BACKGROUND

This case concerns the sale of a racehorse named Salina. Stephens originally purchased Salina at a Keeneland sale in September 2012. Keeneland is a combination race track and horse sales company located in Lexington, Kentucky. Prior to being purchased by Stephens, Salina had undergone "arthroscopic surgery on the right hind fetlock." R. 36–12. The parties dispute whether Stephens knew of the prior surgery when it sold Salina to Biszantz.

In the months after purchasing Salina, Stephens employed Dr. Greg BonenClark to examine an abnormality with Salina's left hind fetlock, which is not the leg that underwent prior surgery. Dr. BonenClark noted "a grade 2 lesion of the left hind medial suspensory branch" and "moderate sesamoiditis," diagnoses that describe the connection of tendons to the bone. R. 36–3, PageID 630, 633. Dr. BonenClark reported the sesamoiditis to Stephens, but

not the lesion, at least as to that term. Salina underwent training during this time period, though the parties dispute the regularity and intensity of that training.

On April 9, 2013, Biszantz purchased Salina from Stephens at Keeneland's annual Two–Year–Olds in Training Sale. After Salina failed to reach Stephens's reserve price of $290,000 in the auction ring, Stephens's agent, John Stephens (Mr. Stephens, to avoid confusion with Appellee), contacted Biszantz's agent, Steve Young, to offer Salina for sale. Mr. Stephens had previously told Young that he "liked [Salina] a lot." R. 36–13, PageID 732. Young testified that he took this statement to mean "that [Mr. Stephens] thought [Salina] was going to bring quite a bit of money." *Id.* Young made a $175,000 offer on behalf of Biszantz, which Stephens accepted.

Prior to the sale, Stephens hired Dr. Michael J. Chovanes to take radiographs to be placed in Keeneland's Repository, which holds relevant information on a horse for prospective purchasers to review. Based on the radiographs, Dr. Chovanes noted to Stephens "a moderate sesamoiditis in a left hind ankle" and prepared a radiological report summarizing his findings. R. 36–9, PageID 700. Upon purchasing Salina, Biszantz retained Dr. Scott Hay to examine the Repository's radiographs; Dr. Hay did not see sesamoiditis in the radiographs and did not request Dr. Chovanes's radiological report. Though the parties dispute whether the report was in the Repository (and if it was there, whether it was accessible), Dr. Hay testified that the report was in the Repository and that he could have requested it but, based on the radiographs, did not because "I would rather take my own opinion." R. 36–11, PageID 722. Biszantz did not perform additional radiographs or ultrasounds on Salina before taking her from Keeneland. Stephens did not disclose Salina's prior surgery, and the parties dispute whether Stephens's medications disclosure, which was not signed by a veterinarian, included all of the medications given to Salina in the 14 days prior to the sale.

Following several months of post-sale training, Salina began demonstrating signs of pain. Biszantz hired Dr. Lawrence Bramlage to examine Salina. Based on new radiographs and ultrasounds, Dr. Bramlage diagnosed avulsion fractures and a left hind medial suspensory branch injury starting at the sesamoid bone. Dr. Bramlage also studied Dr. Chovanes's April radiographs, coming to the same conclusion as Dr. Hay—that they showed no signs of a bone condition. Biszantz soon received a bill for pre-sale tendon work on Salina, however, through which he learned for the first time of her pre-sale bone condition. The parties dispute whether the pre-sale bone condition was related to the post-sale injuries.

## II. LEGAL STANDARD

Grants of summary judgment are reviewed de novo. *See V & M Star Steel v. Centimark Corp.,* 678 F.3d 459, 465 (6th Cir.2012). Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We apply Kentucky law in this diversity case. *See Erie R.R. Co. v. Tompkins,* 304 U.S.

64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Legg v. Chopra,* 286 F.3d 286, 289 (6th Cir.2002).

## III. ANALYSIS

After outlining the relevant provisions of the parties' agreement, we analyze Biszantz's breach of contract, breach of express warranty, and fraud claims below.

### A. Keeneland's Conditions of Sale

At the time of the sale, both Biszantz and Stephens contractually agreed that Keeneland's Conditions of Sale (the COS) would govern the transaction. The COS provides that prospective purchasers "are accepting any horse purchased with all faults, including all conditions and defects except for applicable limited warranties set out in Conditions NINTH through FOURTEENTH." R. 21–2, PageID 174. The COS disclaims all other warranties, express or implied, and specifically instructs that oral statements on the physical condition or racing abilities of a horse do not constitute warranties. Even under the limited warranties given by the COS, rejection shall be the purchaser's sole and exclusive remedy. "In all other respects the **AS IS** nature of this sale remains in full force and effect." *Id.* at 189.

Relevant here are the warranties contained in Conditions NINTH and THIRTEENTH. The NINTH Condition requires the disclosure—by placement of a veterinary certificate in the Repository or announcement at the sale—of any invasive joint surgery performed on a horse two years of age or less. The parties agreed that any allegation of breach of this provision must be asserted within 14 days of sale.

The THIRTEENTH Condition applies to two-year-olds in training and requires disclosure of (1) any medication administered within 14 days prior to sale and (2)

"an injury to or disease of the bone structure which, in the opinion of a veterinarian, would more likely than not materially and adversely affect its suitability for training and racing." *Id.* at 184–85. Under the first provision, disclosure of medications must be given by placement of a veterinarian-signed certificate in the Repository, and the parties agree that any breach must be asserted within 14 days of the sale. Disclosure of bone conditions may be given by announcement at the time of sale or by placement of radiographs or a veterinary certificate in the Repository that reasonably discloses the injury or disease. Breach of the second provision must be alleged within 24 hours of sale and before the horse leaves Keeneland. Notice must be given before rejection, and any claim of breach must be supported by radiographs taken within 24 hours of sale and a veterinary certificate. If post-sale a purchaser believes that the Repository information does not reasonably reveal a material and adverse bone condition, the dispute is resolved by a panel of veterinarians.

The COS explains the basis of its seemingly harsh time limitations: "The physical condition of horses is subject to material change on a daily basis. **Time is of the essence.**" *Id.* at 181. In other words, the time limitations are premised on the fact that the sale is an "as is" transaction. To that end, the TWENTY–FIRST Condition reminds purchasers that they are responsible for fully inspecting each horse before purchase and "will be charged with knowledge of any defect that is or should be revealed by a reasonable inspection, including any defect that is or should be revealed by a review of the Repository information...." *Id.* at 193. The COS specifies that a full inspection shall include a review of all Repository information, in-

cluding all radiographs and veterinary radiographic reports.

## B. Breach of Contract

■ The district court granted summary judgment to Stephens on Biszantz's breach of contract claim because Biszantz did not pursue the COS's exclusive remedies within the time limits provided. The parties agree that the COS gave Biszantz 14 days to claim an undisclosed prior surgery or administration of medication and 24 hours to claim an undisclosed bone condition. Biszantz argues, however, that the COS's time limits are unenforceable, being unconscionable and failing at their essential purpose, because they do not provide enough time to discover a prior surgery, administration of medication, or bone condition.

Courts do not enforce unconscionable contracts. An unconscionable contract is one that "no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1074 (6th Cir.1997) (applying Kentucky law). The doctrine of unconscionability "forbids only one-sided, oppressive, and unfairly surprising contracts, and not mere bad bargains." *Id.* (citing *Louisville Bear Safety Serv., Inc. v. S. Cent. Bell Tel. Co.*, 571 S.W.2d 438, 439 (Ky.Ct.App.1978)). We consider claims of unconscionability on a case-by-case basis because of the fact-sensitive nature of unconscionability determinations. *Id.* (citing *Wickliffe Farms, Inc. v. Owensboro Grain Co.*, 684 S.W.2d 17 (Ky.Ct.App.1984)).

A Kentucky statute based on the Uniform Commercial Code (UCC) similarly provides relief from a contract "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." Ky.Rev.Stat. Ann. § 355.2–719(2). "A lim-

itation of remedy provision fails of its essential purpose when it deprives a party of the substantial value of its bargain." *U.S. Achievement Acad., LLC v. Pitney Bowes, Inc.*, 458 F.Supp.2d 389, 404 (E.D.Ky. 2006). There are "relatively few situations where a remedy can fail its essential purpose," and the Kentucky statute "has been invoked most often in cases in which the exclusive remedy involves replacement or repair of defective parts, and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition." *Id.* (quoting *Rudd Constr. Equip. Co. v. Clark Equip. Co.*, 735 F.2d 974, 981 (6th Cir.1984)).

In support of his unenforceability arguments, Biszantz cites the Fayette County Circuit Court's summary judgment order in *Solitary Oak Farm, Inc. v. Murphy*, No. 09–CI–4145 (Jan. 16, 2011), another Keeneland horse-sale case. There the purchaser's agent explicitly inquired whether the colt had undergone any surgeries. Although the colt had undergone invasive joint surgery, the seller's agent affirmatively denied it and did not make the disclosures required by the NINTH Condition of the COS. The purchaser did not learn of the invasive joint surgery until some four months later, while shaving the colt's leg in preparation for a second surgery. The state court struck as unconscionable the COS's 14–day time limit to claim nondisclosure of a prior surgery as applied to the facts before it. Specifically, emphasizing the intentional, oral misrepresentation by the seller's agent, the court found the colt's invasive joint surgery difficult if not impossible to discover within the 14–day period. On that same basis, the court also held that the time limit was "inconsistent" with the warranty's purpose of protecting against a fraudulently induced purchase. That holding did not rely

on Kentucky's failure-of-essential-purpose statute but on another statute providing that limitations to express warranties are inoperative where they cannot be reasonably construed as consistent with the express warranty. *See* Ky.Rev.Stat. Ann. § 355.2–316(1).

In the instant case, there is no evidence of intentional misrepresentation from Stephens's agent to Biszantz's agent that is comparable to the unequivocal lie told by the seller's agent in *Solitary Oak.* The court there found discovery of the breach within the time limit difficult if not impossible due to the lie, a finding that led the court to label the contract something more than a mere bad bargain. Given the fact intensive nature of unconscionability determinations, the lack of an unequivocal lie in the instant case distinguishes *Solitary Oak.*

Turning to the circumstances here, the essential purpose of the NINTH and THIRTEENTH Conditions is to ensure buyers are fully informed of a horse's condition at the time of the "as is" transaction, which is the benefit for which the parties bargained. Strict time limitations are repeated throughout the COS and their purpose is explained: "The physical condition of horses is subject to material change on a daily basis. **Time is of the essence. Failure to strictly comply with the notice requirements hereafter set out shall operate to disallow the protection of the applicable warranty in favor of Purchasers.**" R. 21–2, PageID 181. If the dispute resolution process is not initiated quickly, the determination of a horse's condition at the time of sale, and thus any breach as to the disclosure of the horse's condition, becomes difficult if not impossible to determine. The time limits constitute an essential component of the parties' agreement—as the COS explains throughout, "[t]ime is of the essence." *Id.* at 181, 194.

Both Biszantz and Stephens were sophisticated horsemen—likely even merchants under the UCC—who agreed to be bound by the COS. *See* Ky.Rev.Stat. Ann. § 355.2–104(1) (defining merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ."). To avail himself of the COS's warranties, Biszantz knew or should have known, through his own experience and the express provisions of the COS, that he had to act within the prescribed time frames. Within the time frames agreed upon, Biszantz could have made inquiries to Salina's prior owner (under whose ownership the surgery was performed), reviewed veterinary records, or undertaken more intrusive inspections. But Biszantz made no such efforts. Biszantz knew that the medications disclosure lacked a signature at the time of sale but made no direct inquiry to Stephens regarding medications. On bone structure, Biszantz had 24 hours to review the radiographs and radiological report placed in the Repository and to take additional radiographs and ultrasounds. Dr. Hay reviewed those radiographs, but chose not to review the radiological report. Biszantz chose not to perform additional scans before leaving Keeneland, despite having the means to do so.

The contract between Biszantz and Stephens was not "one-sided, oppressive, [or] unfairly surprising," and the COS's time limits as applied to the facts before us are not unconscionable. Nor do the time limits fail of their substantial purpose, as the circumstances did not prevent Biszantz from discovering alleged breaches within the time given. The COS's time limitations are enforceable against Biszantz.

## C. Express Warranty

■ Having found that Biszantz failed to timely avail himself of the COS's reme-

dies, we move to Biszantz's claim that Mr. Stephen's pre-sale statement to Young, that he "liked [Salina] a lot," created an express warranty that Salina had no significant problem impacting her ability to train or race. In Kentucky, a seller's positive affirmation of fact relating to the subject matter—that is, something more than ordinary puffing, sales talk, or expressions of opinion—"may constitute an express warranty if it induced the sale and the buyer relies upon it." *King v. Ohio Valley Terminix Co.*, 309 Ky. 35, 214 S.W.2d 993, 996 (1948); *see* Ky.Rev.Stat. Ann. § 355.2–313 ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," but "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.").

Stephens argues that the circumstances surrounding the Washington Supreme Court's opinion in *Travis v. Washington Horse Breeders Association* are analogous to the facts here. 111 Wash.2d 396, 759 P.2d 418 (1988). There an equine auction advertised "truly outstanding" horses that were "bound to run." *Id.* at 419. Statements were made that the particular horse in question was "a fine athlete" and "in very good condition." *Id.* The court upheld the jury's verdict that these statements had created an express warranty that the horse was "healthy and fit for racing and breeding purposes." *Id.* at 422.

As the district court pointed out, however, Mr. Stephens's statement that he "liked [Salina] a lot" is much closer to sales talk or his own expression of opinion than the positive affirmations commenting on the physical condition, ability to race, and athletic prowess of the horse in *Travis*. In

fact, even Young interpreted Mr. Stephens's statement to mean "that [Mr. Stephens] thought [Salina] was going to bring quite a bit of money." Mr. Stephens's statement did not create an express warranty, and thus we need not decide whether the warranty disclaimer of the COS bars any other outside warranty. Even so, we note that the Eastern District of Kentucky has repeatedly enforced the COS's "as is" provision. *See, e.g., Keeneland Ass'n, Inc. v. Hollendorfer*, 986 F.Supp. 1070, 1073 (E.D.Ky.1997) (holding that buyer was "saddled by the sale" because the COS contains an "as is" clause and "disclaim[s] the existence of warranties, either expressed or implied, which are not contained" therein); *Keeneland Ass'n, Inc. v. Eamer*, 830 F.Supp. 974, 985–87 (E.D.Ky.1993) (holding buyer not entitled to rescission of sale based on unconscionability because of the COS's "as is" clause, which properly disclaims all express and implied warranties).

### D. Fraud

Finding no relief in his contractual claims, Biszantz lastly alleges fraud, both through affirmative misrepresentation and omission. At the summary judgment stage, a plaintiff must provide concrete evidence establishing a genuine issue of material fact to satisfy each element of fraud by a clear and convincing standard. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446–47 (6th Cir.1993).

Stephens first argues that the economic loss doctrine bars Biszantz's claims of fraud. The district court determined that the Kentucky Supreme Court would extend the economic loss rule to bar contractually based fraud claims. R. 47, PageID .925–27. Even assuming that Kentucky would adopt the minority view and apply the economic loss doctrine to bar contractually based fraud claims, *see* Ralph C.

Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine*, 90 Marq. L. Rev. 921, 931–33 (2007) (explaining that majority approach is to allow broad exception to the economic loss doctrine for all claims of fraud), we doubt that Kentucky would employ the doctrine to bar fraud claims seeking rescission, *see Harley–Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 981 (7th Cir. 2003) (holding that even Wisconsin, which has one of the broadest coverages of the economic loss doctrine, "would not apply [it] to bar" an action "for the rescission of a contract"). Biszantz appears to have pled rescission in the complaint. *See LV Ventures, LLC v. Schott*, No. 2011–CA–000473–MR, 2012 WL 5039235, at *4–5 (Ky.Ct.App. Oct. 19, 2012) ("[A] party may alternatively plead both a fraudulent inducement claim and a breach of contract claim in his or her complaint," but "may not recover upon both claims" and, upon remand, must "elect to either seek recovery upon the claim of fraudulent inducement or the claim of breach of contract before retrial."). We need not resolve this issue, however, because Biszantz fails to satisfy the elements of his claims of fraud.

### 1. Fraudulent misrepresentation

To establish fraudulent misrepresentation under Kentucky law, a plaintiff must prove by clear and convincing evidence: (1) a material representation that (2) is false and (3) declarant knows to be false or made recklessly; (4) that declarant induced the plaintiff to act upon the misrepresentation; (5) that the plaintiff relied upon the misrepresentation; and (6) that the misrepresentation caused injury to the plaintiff. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 548–49 (Ky.2009). An actionable representation "must relate to a past or present material fact which is likely to affect the conduct of a reasonable man and be an inducement of the con-

tract." *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky.1955).

Fraud generally cannot be premised on "[a] mere statement of opinion or prediction" or "mere optimism, even excessive optimism." *Flegles, Inc.*, 289 S.W.3d at 549–550. Exceptions exist where the opinion or prediction "incorporates falsified past or present facts" or "is so contrary to the true current state of affairs that ... [it] is an obvious sham." *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 249 (6th Cir.2012) (alterations in original) (quoting *Flegles, Inc.*, 289 S.W.3d at 549).

■ In support of his fraudulent misrepresentation claim, Biszantz points to Mr. Stephens's statement that he "liked [Salina] a lot." Instead of actionable misrepresentation, that statement is more akin to an optimistic opinion or prediction of sale, and Young in fact interpreted it as a prediction of sales potential. The statement did not incorporate any falsified facts, nor was it so contrary to the truth as to be an obvious sham, as the evidence shows that before the sale Salina was stable enough to undergo some training. Moreover, it is unlikely that a mere optimistic prediction of sales potential, without something more, induced Biszantz to agree to the contract. Thus, the statement does not satisfy the falsity and inducement elements of fraudulent misrepresentation.

### 2. Fraud by omission

Pursuant to Kentucky law, a plaintiff seeking to prove fraud by omission must show: "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Giddings & Lewis, Inc.*

*v. Indus. Risk Insurers,* 348 S.W.3d 729, 747 (Ky.2011). "The existence of a duty to disclose is a matter of law for the court." *Id.* Kentucky recognizes a duty to disclose where, among other circumstances, "a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure" or "one party to a contract has superior knowledge and is relied upon to disclose same." *Id.* at 747–48. These duties are outside and in addition to any specific duties to disclose contained in a contract, and thus are not subject to the COS's time limits.

Biszantz alleges on appeal that Stephens fraudulently failed to disclose Salina's prior surgery, medications, and bone condition. As to the first factor, a duty to disclose, Biszantz points to Stephens's allegedly superior knowledge and the fact that Stephens partially disclosed some medications, but not all, and agreed to disclose prior invasive joint surgeries and bone injuries, but did not. We assume without deciding that Stephens had a duty to disclose here.

In examining the second factor on the question of Salina's bone condition, the district court held that the condition was disclosed completely by Dr. BonenClark's radiographs and veterinary radiological report, which were included in the Repository. Biszantz disputes the district court's findings that the radiographs alone disclosed the bone condition and that the report was included in the Repository and accessible at the time of sale. As evidence of the report's inaccessibility, Biszantz cites deposition testimony from Dr. BonenClark and Dr. Chovanes. Dr. BonenClark testified that such reports "are not made available for the veterinarians who are inspecting the horses on behest of potential buyers"; he admitted, however, that radiological reports are placed in the Repository. R. 36–3, PageID 629. Like-

wise, Dr. Chovanes testified that "at that time it became a new policy of Keeneland to have a copy of the radiology report on file in the repository but not for everybody to look at." R. 36–9, PageID 701.

Dr. Hay, employed by Stephens to inspect Salina after the sale, testified that "Keeneland's policy at that time would be that [the report] would be separately available on request only" and that, under this policy, the report was available to him. R. 36–11, PageID 722, 728. This is consistent with allegations in Biszantz's complaint that the report was in the Repository and with the provisions of the COS that instruct purchasers to examine all information in the Repository, including radiographs and radiological reports. In addition, Dr. Hay testified that he chose not to request the radiographic report because such a report "oftentimes is done by a veterinarian that is in direct employ of the consigner and, therefore, the concern of some conflict of interest there arises.... I would rather take my own opinion [of the radiographs]." *Id.* at 722.

■ Biszantz's argument that the report was not accessible is based on conjecture that such reports generally were unavailable to veterinarians, which conflicts with his own veterinarian's testimony. He cites no evidence that the report was inaccessible to purchasers, which would conflict with the provisions of the COS. Dr. Hay testified, moreover, that he chose not to request the report, although it was available to him, because he prefers to make his own conclusions on the radiographs, which were indisputably of Salina. Biszantz thus fails to raise a genuine or material dispute as to disclosure of the bone condition because the evidence reveals that the bone condition was disclosed, if not by the radiographs, by the report.

■ As for Biszantz's fraud-by-omission claims based on the undisclosed prior surgery and alleged administrations of medication, because the parties did not brief the third factor, that the failure to disclose induced the plaintiff to act, we turn to the fourth factor, whether the nondisclosures caused actual damages. There is no record evidence that the prior surgery or allegedly undisclosed medications had any impact on Salina's value or performance. Salina's post-sale health issues concerned her left hind leg. The prior surgery was performed on Salina's right hind leg, which is not alleged to have had post-sale complications. Biszantz presents no evidence linking the prior surgery or medications to complications with Salina's left hind leg nor does he show that either caused damages.

Biszantz did raise several objections to the district court's finding on the fourth factor. Biszantz first contends that Kentucky law does not require a showing of actual damages to rescind a contract due to fraud by omission, citing in support the Restatement (Second) of Contracts, section 164, and *Provident Savings Life Assurance Society v. Whayne's Administrator*, 131 Ky. 84, 93 S.W. 1049 (1906). There the plaintiff brought an action for damages pursuant to a life insurance contract, against which the defendant raised as a defense the plaintiff's alleged misrepresentation of his health, previous illness, and prior rejections by other companies. 93 S.W. at 1050. In discussing the meaning of "materiality," the Kentucky Court of Appeals—the highest state court at the time—found that "it [is not] material whether the misrepresentation caused the loss or not. The inquiry is not directed, necessarily, to that fact. But it is whether the fact misrepresented is material to the contract—in insurance, is material to the risk imposed by the contract." *Id.* at 1051.

The quoted text suggests that materiality refers to a misrepresented fact's importance to a party's decision to assume the risk of the contract; in other words, materiality does not turn on whether the misrepresentation caused the loss. *See id.* at 1051. This analysis, however, does not prohibit a more general causation of harm from being necessary in addition to materiality. The Kentucky Supreme Court elevated it to a required factor in subsequent cases, without any distinction between damages and rescission, requiring that the plaintiff prove that he suffered actual damages as a result of the fraud by omission. *See, e.g., Giddings*, 348 S.W.3d at 747.

Biszantz next argues that the fourth factor is an improper consideration on appeal because it was raised *sua sponte* by the district court before discovery or dispositive motions regarding damages. The record suggests otherwise. Stephens argued at summary judgment that Biszantz suffered no injury because he received Salina "as is," Salina's prior surgery was performed on a different leg, and the allegedly undisclosed medications had no effect. Biszantz did not respond to these arguments, apparently on the basis that fraud by omission does not require injury. As explained above, Kentucky law does require proof of actual damages. Moreover, Biszantz agreed to and proposed the limited discovery plan adopted by the district court, and at summary judgment neither objected to Stephens raising the issue nor requested additional discovery after Stephens had done so. Biszantz was required to present concrete evidence supporting each element of his fraud claim by clear and convincing evidence. *See Moore, Owen, Thomas & Co.*, 992 F.2d at 1446. Biszantz did not do so for his claims regarding the undisclosed prior surgery and medications and thus fails to satisfy the

elements of these fraud-by-omission claims.

breach of contract, breach of express warranty, and fraud claims.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Biszantz's