[No. 16993-9-I. Division One. March 30, 1987.]

ROBERT M. TRAVIS, ET AL, *Respondents,* v. WASHINGTON HORSE BREEDERS ASSOCIATION, INC., ET AL, *Appellants.*

*John Woodley, John Mellen,* and *Woodley & Thurston,* for appellants.

*Peter Mair* and *Mair, Abercrombie, Camiel & Rummonds; Steven Gaines; Malcolm L. Edwards* and *Edwards & Barbieri,* for respondents.

*Kenneth O. Eikenberry, Attorney General, John Ellis, Senior Assistant,* and *David B. Robbins* and *Tina E. Kondo, Assistants,* amici curiae.

WILLIAMS, J.—This action was brought by Robert M. Travis and his business partner against Washington Horse Breeders Association, Inc., and Northwest Farms to rescind the sale of a racehorse. The case was tried before a jury, and resulted in a verdict in Travis' favor of $25,000 for recovery damages, $14,010 incidental damages, $11,480

prejudgment interest, $1,939 post–verdict incidental damages, $2,000 Consumer Protection Act damages, $31,189 costs and $144,062 attorney fees. Judgment was entered accordingly and Washington Horse Breeders and Northwest Farms appeal.

The facts out of which the litigation arose may be summarized as follows: On August 24, 1981, Washington Horse Breeders conducted its annual Summer Yearling Sale at its pavilion at Longacres Race Track in King County. The horses to be sold were advertised on television and in sporting journals as "truly outstanding," "bound to run," and "the very best with respect to pedigree and conformation." Travis, a relative newcomer to the sport of horse racing, arrived at the pavilion 4 days early to examine the horses and talk about the prospects of buying. He was told by the agent from Northwest Farms, whose horse he subsequently bought, that it was a "fine athlete" and was in "very good condition," that "there had been no problems with the horse" and "when it was in the field with the other horses, it was the leader of the pack." The horse was listed in the 1981 Summer Yearling Sale catalog as engaged to run in the Washington Stallion Stakes, Gottstein Futurity, Spokane Futurity, Yakima Del Mar Race and the Longacres Lads Stakes.

At the sale on the 24th, Travis made a successful bid of $25,000 for the horse and took delivery. A week later, it was examined by a veterinarian who found it had a heart murmur. This was confirmed at the Washington State University College of Veterinary Medicine by two veterinarians who reported it had a ventricular septal defect. Travis' demand for rescission and return of his money was rejected and this action was commenced.

Basically, the case comes in two parts: (1) an action for rescission of the sale and recovery of the purchase price and costs of care, and (2) an action for violation of the Consumer Protection Act, RCW 19.86, with attendant attorney fees and costs.

In the action for rescission and recovery, the principal

issues are breach of warranties and waiver. There is substantial evidence to support the jury's determination that the horse did not meet either the implied warranties of merchantability and fitness for a particular purpose, RCW 62A.2–314, .2–315, or the express warranties made by the agent or in the advertisements. The veterinarian who examined the horse 1 week after the sale discovered a "very loud and ominous" heart murmur, leading him to make a presumptive diagnosis of ventricular or septal defect. The Washington State veterinarians, in confirming this, said the horse was "unsafe to be used as an athlete with a rider aboard." In addition, the probability that the defect was genetically transmitted detracted from the horse being used for breeding purposes.

■ The disclaimer of implied warranties carried in the sales catalog was invalid because it was not explicitly negotiated between the buyer and the seller. As the court noted in *Berg v. Stromme,* 79 Wn.2d 184, 193–94, 484 P.2d 380 (1971):

> [A waiver of quality or capability], even though printed, should not be allowed to arise from the fine print to haunt the buyer . . . unless he has agreed to be bound by it with the same degree of explicitness that he bound himself to the other vital conditions of the contract of purchase.

The argument that the enactment of the UCC, and specifically RCW 62A.2–316, superseded the *Berg* requirement that disclaimers be negotiated is without merit. *Thomas v. Ruddell Lease–Sales, Inc.,* 43 Wn. App. 208, 213, 716 P.2d 911 (1986). There is no evidence Travis knew of the disclaimer or negotiated for it. *See Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,* 28 Wn. App. 539, 545, 625 P.2d 171 (1981). The court properly excluded evidence of the disclaimer.[1]

■ In connection with the action for rescission, it is also

---

[1] We note that in 1982, after this case arose, an addition was made to RCW 62A.2–316 providing "there are no implied warranties as defined in this article that . . . livestock are free from sickness or disease". RCW 62A.2–316(3)(d).

argued that the court should not have excluded evidence of Northwest Farms' offer to repurchase the horse. The proposal was to pay Travis $5,000 for return of the horse, leaving resolution of the obligation for the balance to this litigation. The effect of the offer would have been to obviate the need for Travis to care for the horse pending the court proceedings. Travis' costs were ultimately expressed in the $14,010 incidental damages. The court properly ruled that the evidence was an offer of compromise and should be excluded. ER 408. The relief sought by Travis was return of the full purchase price of $25,000. If unsuccessful, all he would have had was the horse, which may have been worth more than the $5,000 offered. Washington Horse Breeders cites no authority requiring a buyer in these circumstances to speculate upon the true value of the property sold, and we know of none.

The second part of the case concerns the Consumer Protection Act. For there to have been a violation of the act under the law existing at the time of trial, the conduct complained of must:

(1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest.

*Anhold v. Daniels,* 94 Wn.2d 40, 45, 614 P.2d 184 (1980).

There was substantial evidence introduced that the horse purchased by Travis was touted as one of the best yearlings in the state, with great prospects to win, even though there had been no physical examination required or administered. Washington Horse Breeders argue that the customary method of careful selection of candidates for the annual sale and the practice of having a veterinarian examine a horse only when a defect became apparent was adequate protection of the public. The appropriate safeguard, whether a presale physical examination or the customary practice, was a question of fact for the jury. With modern medical and marketing practices, it seems incredible that an examination was not uniformly given to horses rated as the best before they were placed in the auction for sale.

Travis believed the horse was sound and healthy; under these circumstances, any prospective consumer reasonably could have had the same understanding. A jury could reasonably find from the evidence that there were deceptive and unfair practices.

The evidence also established that the deceptions led Travis into purchasing the horse to his damage. In addition, substantial evidence demonstrated that representations such as these were standard practice with the Washington Horse Breeders; its annual Summer Yearling Sale had been conducted the same way for many years, and there was nothing to suggest the practices would be changed. A continuing potential for the buying public to be misled into purchasing horses with defects discoverable by a routine physical examination was clearly shown. Thus, a reasonable jury could find an impact on the public interest as well. Given all the evidence, the jury's finding that the Consumer Protection Act had been violated was appropriate.[2]

The principal issue on this appeal is the trial court's award of attorney fees and costs. At the time of the auction, the Consumer Protection Act provided that any injured person:

> may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him, or both, together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained: *Provided,* That such increased damage award for violation of RCW 19.86.020 may not exceed one thousand dollars.

Former RCW 19.86.090 (Laws of 1970, 1st Ex. Sess., ch. 26, § 2).

---

[2]The test for determining a violation of the Consumer Protection Act was refined in the recent case of *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 719 P.2d 531 (1986). Although the opinion is prospective only, the five elements required by it were also met in this case.

Travis and his partner each received $1,000 under the act for damages. In addition, the following attorney fees and costs were awarded:

Attorney Fees
| | | |
|---|---|---|
| (1) Steven Gaines | | |
| (a) pre–verdict | | $70,402.50 |
| (b) post–verdict | | 4,704.00 |
| (2) Peter Mair | | |
| (a) pre–verdict | | 61,587.00 |
| (b) post–verdict | | 7,368.75 |
| Total | | $144,062.25 |

Costs
| | |
|---|---|
| (1) Steven Gaines | $4,749.91 |
| (2) Peter Mair | 22,472.17 |
| (3) post–verdict expert witness fees | 3,967.50 |
| Total | $31,189.58 |

The Consumer Protection Act declares unlawful any unfair or deceptive practice occurring in trade or commerce. RCW 19.86.020. To protect the public and foster fair and honest competition, the act enables individuals to enforce its provisions by reimbursing them for the expense of their efforts. Practically speaking, the greatest expense to be borne by a consumer in enforcing the act is for attorney fees. *St. Paul Fire & Marine Ins. Co. v. Updegrave,* 33 Wn. App. 653, 659, 656 P.2d 1130 (1983). This case is illustrative; upwards of $175,000 in attorney fees and costs were incurred for the successful prosecution of a $25,000 civil claim. While such a sum seems patently unreasonable, to enforce the provisions of the CPA may reasonably require such expenditures. *Riverside v. Rivera,* ___ U.S. ___, 91 L. Ed. 2d 466, 106 S. Ct. 2686 (1986); *State v. Ralph Williams' North West Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 533 P.2d 423 (1976), *appeal dismissed,* 430 U.S. 952 (1977).

At the hearing to determine the reasonableness of fees and costs, the court applied the standard established in

*Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983). Known as the "lodestar" formula, it arrives at a basic fee (lodestar) by multiplying the reasonable number of hours expended by a reasonable fee per hour, then allows a discretionary multiplier for quality of work and the contingent nature of the fee. Upon conflicting evidence, the court found[3] attorney Mair reasonably devoted 122.95 hours to the case at a reasonable rate of $110 per hour and attorney Gaines reasonably devoted 374.8 hours at a reasonable rate of $100 per hour. *See Nordstrom, Inc. v. Tampourlos,* 107 Wn.2d 735, 743–44, 733 P.2d 208 (1987). The rates and hours of their subordinates were also found to be reasonable, as were costs of $31,189.58. As permitted by *Bowers,* the court then applied a multiplier of 1.5 to the lodestars of both attorneys; to Mair's for quality of work, and to Gaines' for quality of work and because his fee was contingent upon the court awarding an amount sufficient to pay Mair's fee first and then his own.

■ These multipliers were not appropriate. Compensation for the quality of the work was settled by the lodestar computation. As was noted in *Bowers,* at 599:

> [Quality of work] is an extremely limited basis for adjustment, because in virtually every case the quality of work will be reflected in the reasonable hourly rate.
> A quality adjustment is appropriate only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the "lodestar."
> *Copeland v. Marshall,* 641 F.2d [880] at 893 [(D.C. Cir. 1980)].

And in *Pennsylvania v. Delaware Vly. Citizens' Coun. for Clean Air,* ___ U.S. ___, 92 L. Ed. 2d 439, 457, 106 S. Ct. 3088 (1986), the Supreme Court observed:

---

[3]No formal findings were entered as would have been most helpful for this review. *State v. Agee,* 89 Wn.2d 416, 421, 573 P.2d 355 (1977). However, the court did give an oral decision reflecting its judgment on the basic points. *State v. Myers,* 86 Wn.2d 419, 429, 545 P.2d 538 (1976).

[W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests.

There is no specific evidence in the record to demonstrate why the hourly rates used to calculate the lodestars did not provide reasonable fees. While both attorneys did excellent work, such should be the case no matter what the hourly rate. Attorneys owe a duty to their clients and to the public to perform to the best of their abilities. Unless the quality of representation is exceptional, a multiplier for quality is inappropriate. *Bowers.*

The 1.5 multiplier applied to the lodestar of attorney Gaines was also for the contingent character of his representation. The contingency adjustment is designed solely to compensate for the risk that no fee would be recovered. *Bowers,* at 598. At the fee hearing, several witnesses testified that Gaines' chances of recovery were remote; one witness said Gaines "took an enormous risk in going contingent." There is an inherent incongruity between this prospect and the actions taken.

Not long after undertaking representation of Travis on a contingency basis, Gaines brought Mair in to act as lead trial counsel. Mair's representation was not contingent; Travis agreed to pay him a fixed contract rate of $100 per hour, $1,000 per day of trial and costs. To obligate Travis to such a large fixed liability is inconsistent with the claim that the case had little chance of success. As things turned out, Mair's preverdict attorney fees and costs amounted to $63,130.92, a sum Travis would have had to pay if the "enormously risky" case had been decided adversely. Although this court may not decide facts from the evidence presented at trial, it can decide that as a matter of law under these circumstances, the multiplier was unreasonable.

As to costs, only those defined by RCW 4.84.010 may be taxed. *Nordstrom,* at 743. The $18,289 for a video exhibit of

the horse's heart and other costs not included in the statute are disallowed.

The judgment is modified to exclude the 1.5 multipliers of the attorney fees and the cause is remanded for recalculation of trial costs and for determination of respondent's attorney fees and costs on appeal.

COLEMAN and GROSSE, JJ., concur.

Reconsideration denied July 2, 1987.

Review granted by Supreme Court October 6, 1987.