[No. 54204–0. En Banc. July 15, 1988.]

ROBERT M. TRAVIS, ET AL, *Respondents,* v. WASHINGTON HORSE BREEDERS ASSOCIATION, INC., ET AL, *Petitioners.*

*Woodley & Thurston,* by *John M. Woodley* and *John Mellen,* for petitioners.

*Edwards & Barbieri,* by *Malcolm L. Edwards,* and *Mair, Abercrombie, Camiel & Rummonds,* by *Peter K. Mair,* for respondents.

*Kenneth O. Eikenberry, Attorney General, John R. Ellis, Deputy,* and *Betsy R. Hollingsworth, Tina E. Kondo, David B. Robbins,* and *Karl R. Boettner, Assistants,* amici curiae for respondents.

DOLLIVER, J.—Defendants Washington Horse Breeders Association, Inc. (WHBA) and Northwest Farms (the sellers) appeal a Court of Appeals judgment modifying a trial court judgment in favor of plaintiffs (Travis).

On August 24, 1981, Travis purchased a colt, Hip No. 2, at WHBA's summer yearling sale auction for $25,000. Travis had become familiar with the sale through advertisements which promoted the horses offered as "truly outstanding" and "'bound to run'". These advertisements had been on television, appeared in "The Washington Horse" magazine and the "Daily Racing Form", and were aimed at

all prospective buyers, including those who had never purchased before.

During the 4 days preceding the sale, Travis had visited the auction grounds. There he had met Dale Leach, the agent of Northwest Farms, who told him Hip No. 2 was "a fine athlete" and "in very good condition." Travis obtained a copy of the sales catalog upon arrival at the sale. At no time other than during the auction were there explicit negotiations between Travis and the sellers.

One week after the sale, the colt was examined by Travis' veterinarian who detected a loud heart murmur. Travis immediately contacted the sellers and requested a rescission of the sale, which was refused. The sellers took the position, based on language in the catalog, that the sale could not be rescinded once the colt was removed from the auction grounds. Travis obtained a more definitive diagnosis—that the horse was unsound and should not carry a rider. At that juncture both sellers took the position the sale was final. The sellers based their position on disclaimers of warranty contained in "Conditions of Sale" located in their sales catalog. Travis then filed this action.

Subsequent to the filing of the lawsuit but prior to the trial, Northwest Farms offered to repurchase Hip No. 2 for $5,000 without prejudice to the lawsuit. Travis refused this offer. Ultimately, of the causes of action alleged, only the claims on implied warranty of merchantability, implied warranty of fitness for a particular purpose, express warranty, mutual mistake, and the Consumer Protection Act (CPA) (RCW 19.86) were submitted to the jury.

The jury returned verdicts in Travis' favor on each of the five claims with identical findings regarding the amount of damage. The court entered judgment for Travis. The judgment granted rescission and awarded approximately $230,000. The bulk of the award was for attorney fees pursuant to the CPA (RCW 19.86.090). The fees were awarded for work done on both CPA and non–CPA claims because, in the words of the trial court, "all of the claims overlapped and were intertwined in this matter", and "[c]ertain basic facts were essential to each cause of action." The amount of

the fees was determined in part by applying a 1.5 multiplier to the lodestar hourly rate of attorney Steven Gaines. The trial court had applied the multiplier in part because Gaines had performed high quality work and had taken the case for a contingent fee.

The sellers then appealed to the Court of Appeals which modified the judgment by disallowing the multiplier as well as certain costs not at issue here. The balance of the judgment was affirmed. *Travis v. Washington Horse Breeders Ass'n,* 47 Wn. App. 361, 734 P.2d 956 (1987).

Defendant sellers petitioned this court for review challenging the judgment of the trial court on all five claims. Travis asked for review of disallowance of the multiplier. We accepted review and affirm in part and reverse in part.

I

In our consideration of the implied and express warranty claims, we initially discuss the implied warranties. At trial, sellers argued conditions of sale in the sales catalog served as written disclaimers of both an implied warranty of merchantability and an implied warranty of fitness. The sales catalog was admitted into evidence but the disclaimer language was excised by the trial court. The basis of the court's ruling was that the written disclaimer did not bar a claim based on implied warranties. As authority, the court cited *Berg v. Stromme,* 79 Wn.2d 184, 193–94, 484 P.2d 380 (1971), which involved the sale of a new automobile:

> [A waiver of quality or capability], even though printed, should not be allowed to arise from the fine print to haunt the buyer . . . unless he has agreed to be bound by it with the same degree of explicitness that he bound himself to the other vital conditions of the contract of purchase.

Later in *Berg* we said:

> Waivers of [implied] warranties, being disfavored in law, are ineffectual unless explicitly negotiated between buyer and seller and set forth with particularity showing the particular qualities and characteristics of fitness which are being waived.

*Berg v. Stromme, supra* at 196. Parenthetically, we note that in 1982, after this case arose, RCW 62A.2–316 was amended to provide "there are no implied warranties as defined in this article that . . . livestock are free from sickness or disease . . ." (RCW 62A.2–316(3)(d)). This amendment does not apply here.

As a threshold issue, we must consider whether the express and implied warranty provisions of the Uniform Commercial Code (U.C.C.) apply to sales made at auction. We hold they do.

Article 2 of the U.C.C. "applies to transactions in goods . . ." RCW 62A.2–102. "Goods" means anything which is "movable at the time of identification to the contract for sale . . ." RCW 62A.2–105. Under this definition, live animals are "goods", regardless of the manner in which they are sold. Moreover, a clear intent to include auctions within article 2 can be found in RCW 62A.2–328, which contains specific rules regarding sales by auction.

The implied warranty provisions of the U.C.C. apply "if the seller is a merchant with respect to goods of [the] kind" at issue. RCW 62A.2–314(1). A "merchant" is someone who "holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed . . ." RCW 62A.2–104(1). An auctioneer who regularly sells certain types of goods is a "merchant" under this definition (*Powers v. Coffeyville Livestock Sales Co.*, 665 F.2d 311 (10th Cir. 1981) (applying Kansas law)) and is held to the warranty rules set forth in the U.C.C. *Bradford v. Northwest Ala. Livestock Ass'n*, 379 So. 2d 609 (Ala. Civ. App. 1980).

Turning now to the disclaimer issue, we note we observed the rule of *Berg v. Stromme, supra,* a pre–U.C.C. case, "was premised predominately on policy grounds." *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 261, 544 P.2d 20 (1975). The issue, then, is whether the policy expressed by the rule should be extended to auctions.

We have been reluctant to extend the rule in other circumstances. Recently, in the case of *Frickel v. Sunnyside*

*Enters.,* 106 Wn.2d 714, 725 P.2d 422 (1986), we held explicit negotiation is not required to give effect to a disclaimer in a contract for the commercial sale of an apartment complex. ("[In *Berg v. Stromme*] we held that the communicated particular needs of the buyer of an automobile would not be overcome by a boiler–plate exclusion of all warranties, express or implied. That case is quite different from this where the buyers sought no promises, the sellers made none, and the buyers with their lawyer, faced a clause which said the sellers not only made no covenant about the condition of the buildings, but expressly disclaimed any such covenant." *Frickel v. Sunnyside Enters., supra* at 721.)

In *Berg v. Stromme, supra,* prior to actual purchase, the buyer and seller of a new automobile negotiated a wide variety of items. In the words of the court:

> We think it a sound rule, therefore, that, when a purchaser discusses with the seller of a new article and makes a definite part of the contract many variable items such as size, shape, power, color and items of extra equipment or adornment not ordinarily a part of the article but attached to it at the purchaser's option and only upon his explicit assent and agreement and thereby includes them specifically in the contract of purchase, it is presumed that the purchaser does not intend to waive any warranties, implied or express, that the article and the equipment will perform or will reasonably accomplish the function for which it was sold and purchased.

*Berg v. Stromme, supra* at 194. By the very nature of auctions—a public sale to the highest bidder—there are no negotiations such as are typically found in the purchase of an automobile.

A major concern of the *Berg* court was that while the front side of the sales order "consisted almost entirely of blank lines and spaces containing printed notations— designed to be and which were filled in in handwritten words and numbers, presumably by one of the defendant's salesmen or by the prospective buyer . . ." (*Berg v. Stromme, supra* at 190), the reverse side was completely

different. Although there was a merger clause on the front of the sales order, the reverse side

> was a solid mass of even sized and style of printing from top to bottom divided in two columns by a center space a little larger than the side margins. Without indentation for paragraphing, it set forth in block form 15 numbered and itemized terms of contract, the last of which contained subordinate unindented paragraphs running from 15(a) to 15(f), inclusive. This reverse side contained no spaces whatever for signatures, filling in, interlining, or references to other documents. It had no blank spaces, signature lines or other devices by which one would indicate assent, concurrence or agreement.

*Berg v. Stromme, supra* at 191.

Here, in contrast, the catalog notices to buyers were in large, bold type. Reference was made specifically to those pages containing conditions of sale. The conditions of sale, appearing several pages later and placed prior to the listing of the horses for sale, covered four pages, were legible and easy to read. Furthermore, since this was an auction, the bill of sale was on a single page, easy to read, and understandable.

Finally, this sale was in the context of an auction where the "conditions prescribed by the seller or owner and announced at the time and place of the auction are binding on the purchaser whether or not he knew or heard them." *Continental Can Co. v. Commercial Waterway Dist. 1,* 56 Wn.2d 456, 459, 347 P.2d 887, 354 P.2d 25 (1959) (quoting *Moore v. Berry,* 40 Tenn. App. 1, 288 S.W.2d 465 (1955)). *See* RCW 62A.2–328; Restatement (Second) of Contracts § 28, comment *e* (1981). None of the cases cited by Travis to show the applicability of *Berg* to this case involve an auction.

While we need not rule on the vitality of *Berg v. Stromme, supra,* in other contexts, we decline to extend it to auctions. There are in auctions no negotiations similar to those in *Berg v. Stromme, supra.* As sellers state, part of the economic rationale of an auction is to avoid face–to–face negotiations. It is a cost–saving device in which face–to–face negotiations, except as to price, are not engaged in

by the parties. The disclosures were visible, readable, and contained in the sale booklet. Travis is bound by them. It was error for the trial court to refuse to admit that portion of the sales booklet dealing with disclaimer, and it was error to give instruction 34 which stated:

> [W]ritten disclaimers of warranties of fitness (the "Conditions of Sale" formerly listed in the Sales Catalogue) are ineffectual unless explicitly *negotiated between buyer and seller.*

Although the verdict as to implied warranties must be reversed, we find differently as to the express warranties. Special jury verdicts determined that both sellers had made an express warranty that Hip No. 2 was "healthy and fit for racing and breeding purposes." The factual sufficiency of these verdicts went unchallenged at the trial court. *See* RAP 2.5(a); *Smith v. Shannon,* 100 Wn.2d 26, 37, 666 P.2d 351 (1983). In their appeal, however, the sellers assert the statements made to Travis do not constitute express warranties. We disagree. We concur with the holding of the Court of Appeals that there was "substantial evidence to support the jury's determination that the horse did not meet . . . the express warranties made by the agent or in the advertisements." *Travis v. Washington Horse Breeders Ass'n,* 47 Wn. App. 361, 364, 734 P.2d 956 (1987). *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872 (1974). Thus, the only question is whether this express warranty can be disclaimed.

RCW 62A.2–316(1) provides:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; *but . . . negation or limitation is inoperative to the extent that such construction is unreasonable.*

(Italics ours.)

*See* J. White & R. Summers, *Uniform Commercial Code* 430 (2d ed. 1980):

*If the factfinder determines that a seller's statement created an express warranty, words purportedly disclaiming that warranty will have no effect, for the disclaiming language is inherently inconsistent. Thus a seller who explicitly "warrants" or "guarantees" that a car is without defects may not set up a disclaimer of express warranties when sued for the cost of repairing the clutch.*

(Footnotes omitted. Italics ours.) We believe it would be unreasonable to allow a disclaimer for the express warranty found here and thus hold it cannot be disclaimed.

With the disclaimers inoperative to disclaim their express warranty, the sellers were not prejudiced by exclusion of the disclaimers with regard to the verdicts on the express warranty claim. Since the jury made identical damage findings for each of the five claims submitted and there was no other challenge to the express warranty claim, other than that of disclaimer, the verdicts on the express warranty claim are sufficient to sustain the judgment with regard to the sellers' liability.

## II

■ Next we consider the applicability of the CPA. At the time of trial, Travis was required to establish the following elements to show a violation of the CPA (RCW 19.86): (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest. *Anhold v. Daniels,* 94 Wn.2d 40, 45, 614 P.2d 184 (1980). Two years later, this court expanded these elements from three to five in *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 784, 719 P.2d 531 (1986). The plaintiff is still required to prove the three elements set forth above, although the public interest element is "substantially changed". *Hangman,* at 784. The two additional elements are: a fourth element requiring "a showing of injury to plaintiff in his or her business or property" and a fifth element requiring "a causal link . . . between the unfair or deceptive act complained of and the injury suffered." *Hangman,* at 784–85.

Since *Hangman* was decided subsequent to the rise of this litigation, we need to discuss the issue of retroactivity.

Although it might be argued the 5–element *Hangman* test is applicable here ("Hereafter, five elements, all statutorily based, must be established by a plaintiff in order . . . [to] prevail under a private CPA action." (*Hangman,* at 784)), we need not reach the issue of retroactivity. *See Milbradt v. Margaris,* 103 Wn.2d 337, 693 P.2d 78 (1985). Regardless of retroactivity, although the sellers argue there was insufficient evidence to establish the first, third, and fifth elements, we find otherwise.

■ The sellers assert the first element is unsatisfied because there was no evidence any buyer other than Travis purchased a defective horse from WHBA's sale. Although true, this does not mean the first element is unsatisfied.

To establish that there was an unfair or deceptive act,

> [a] plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public. The purpose of the capacity–to–deceive test is to deter deceptive conduct *before* injury occurs.

(Citations omitted.) *Hangman,* at 785.

Here, there was evidence the sellers had represented Hip No. 2 as one of the best yearlings in the state, although the horse had never been given a physical examination. Moreover, the sellers had made these representations in media designed to reach new buyers. Other evidence showed: the sellers had routinely made such representations without knowing whether physical examinations had been given; physical examinations were not routinely given; the selling practices were the custom and usage of the trade; and unsound horses had been sold as a result. This is sufficient to prove the sellers' acts had "the *capacity* to deceive a substantial portion of the public."

■ With respect to the third element, the *Hangman* test for public interest requires the court first to determine whether a case is more properly characterized as a consumer dispute or a private dispute. *See Hangman,* at 789–90. Here, the case can more properly be characterized as a consumer dispute. "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same

fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Hangman,* at 790. That is the situation in this case. Once this determination is made, *Hangman* lists a number of nonexclusive questions which should be asked to determine whether this element is met. *Hangman,* at 790–91. The applicable questions are:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman,* at 790.

All five questions must be answered in the affirmative. As to questions 1 through 4, the record indicates the sellers' practices, conducted in the course of their business, were long standing and had not changed. With regard to the fifth question, as Travis notes, other consumers likely to be affected by the purchase of a defective horse include jockeys and the betting public. The public interest test is met.

Lastly, we find substantial evidence the fifth element of *Hangman* which requires "that a causal link be established between the unfair or deceptive act complained of and the injury suffered" is satisfied. *Hangman,* at 785. As described above, there was evidence the sellers' representations had induced Travis to come to the sale and purchase Hip No. 2 for $25,000. Other evidence indicated Travis had intended to use the colt as a racehorse but that Hip No. 2 was unsound and could not safely carry a rider. There is substantial evidence of a causal link between "the unfair or deceptive act complained of", the sellers' representations, and "the injury suffered"—the loss of $25,000 in exchange for a racehorse that could not be raced. The CPA applies to the facts of this case.

## III

Next, we consider whether the trial court erred by failing to instruct the jury on the reasonableness defense to the CPA claim. The sellers argue their third supplemental instruction should have been submitted to the jury. That instruction provides:

> The Consumer Protection Act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest.

■ The instruction is a correct statement of the law. RCW 19.86.920 states in part:

> It is, however, the intent of the legislature that [the CPA] shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest . . .

Moreover, this language has been endorsed in previous CPA cases. *See State v. Black*, 100 Wn.2d 793, 802–03, 676 P.2d 963 (1984) ("[A]cts or practices which are reasonable business practices or which are not injurious to the public are not the kind of acts sought to be prohibited . . . [A] court must weigh the public interest in prohibiting anti-competitive conduct against the recognition that businesses need some latitude within which to conduct their trade."). *See also Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 54, 738 P.2d 665 (1987) ("Where conduct is motivated by legitimate business concerns, there can be no violation of RCW 19.86.") (citing *State v. Black*, at 802–03).

While amicus curiae correctly notes the "reasonableness defense" has only been applied in antitrust cases, we have not limited the reasonableness defense to antitrust cases nor is such a limitation contained in the statute. We decline to impose a limitation here. If one is needed, it is within the province of the Legislature to provide it.

Travis argues the statutory language (of RCW 19.86.920) does not properly state the law because the language is contained merely in the legislative preamble. What Travis designates as the "preamble" is part of the CPA, first

adopted in 1961. Laws of 1961, ch. 216, § 20, p. 1963. It was not considered a "preamble" then, nor do we consider it a preamble now. Moreover, even if RCW 19.86.920 were found to be a preamble, it would "serve as an important guide in determining the intended effect of the operative sections [of the statute]." *Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 128, 580 P.2d 246 (1978).

The reasonableness defense raised by the sellers' instruction correctly states the law. It was error for the trial court to refuse to give it.

## IV

We next consider the issue of attorney fees awarded to Travis, even though, given our disposition of the case, the jury finding on the CPA is reversed. At the time of trial, RCW 19.86.090 provided in part:

> Any person who is injured in his business or property by a violation of RCW 19.86.020 . . . may bring a civil action . . . to recover the actual damages sustained by him . . . together with the costs of the suit, including a reasonable attorney's fee . . .

Only a successful plaintiff is entitled to fees under the statute. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 795, 719 P.2d 531 (1986). Sellers do not contest the hourly rate of Travis' attorneys and their associates. The Court of Appeals, without comment, accepted the oral findings of the trial court that the number of hours devoted to the case were reasonable. It only disallowed the 1.5 multiplier, here contested by Travis, and other costs not a part of this review.

First, the sellers argue the fee award was unreasonable because it was much larger than the damage award. The amount in controversy is not listed as a factor in one of our most recent decisions reviewing an attorney fee award. *See Boeing Co. v. Sierracin Corp., supra* at 65–66. Moreover, in *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983), our most recent decision to squarely address how fees should be awarded under RCW 19.86.090, the amount in controversy is merely listed as a

factor to be considered. The size of the attorney fees in relation to the amount of the award is not in itself decisive.

The sellers also argue our prior cases affirming large fee awards can be distinguished from this case due to the number of persons harmed. Citing *Riverside v. Rivera*, 477 U.S. 561, 91 L. Ed. 2d 466, 106 S. Ct. 2686 (1986) and *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952, 51 L. Ed. 2d 801, 97 S. Ct. 1594 (1977), sellers assert it must be shown numerous individuals *had* been harmed by their action. This argument is without merit. The test is not whether others had been harmed but whether their acts "had the *capacity* to deceive a substantial portion of the public." As stated earlier in this opinion, there was abundant evidence on this issue. The test for overturning a fee award is abuse of discretion. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, *supra* at 314. On the sole issue of the reasonableness of the rates and hours for the entire case, we find no abuse of discretion.

That does not, however, end our examination of the fees granted by the trial court. The crucial question, regardless of the total fees charged by Travis' attorneys for their services, is whether the entire fee is subject to a CPA award. The sellers contend the trial court erred because some of the fee award related to non–CPA claims. We agree. In *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 744, 733 P.2d 208 (1987), we stated fees awarded under the statute at issue here, RCW 19.86.090, "should only represent the reasonable amount of time and effort expended which should have been expended for the *actions* of [the defendant] which constituted a Consumer Protection Act violation." (Italics ours.) This statement in *Nordstrom* is reinforced by *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 66, 738 P.2d 665 (1987) (affirming a fee awarded under a different statute) which cites *Nordstrom*, at 743, for the proposition that: "[A]ttorney fees should be awarded only for those services related to the causes of action which allow for fees."

The trial court, relying on two witnesses for Travis, resolved the issue by finding the claims "overlapped and were intertwined" and that some basic facts were essential to each cause of action. While a number of fundamental facts are essential to every aspect of the lawsuit, the law pertaining to warranties, a CPA violation, and mutual mistake is not the same. As one of Travis' witnesses conceded, while there may be an interrelationship as to the basic facts, the legal theories which attach to the facts are different. Thus, the court must separate the time spent on those theories essential to the CPA and the time spent on legal theories relating to the other causes of action. This was not done. The amount awarded for attorney fees must be remanded for further consideration by the trial court. This must include, on the record, a segregation of the time allowed for the legal theories pertaining to the CPA as well as to the other legal theories in the case.

As to the 1.5 multiplier, we affirm the view of the Court of Appeals that the granting of the 1.5 multiplier to the attorney fees was inappropriate. In *Bowers v. Transamerica Title Ins. Co., supra,* the court found adjustments to the "lodestar" fee (the total hours reasonably expended multiplied by the reasonable hourly rate of compensation) "are considered under two broad categories: the contingent nature of success, and the quality of work performed." *Bowers,* at 598.

As to the quality of the work performed, although the trial court found the work done by "both plaintiff's counsel was of extremely high quality", there was no finding the representation was "unusually good" or exceptional. *Bowers,* at 599. Thus, the Court of Appeals was correct in denying a multiplier for quality.

With respect to the contingent nature of the representation, the Court of Appeals covered this issue succinctly:

> The 1.5 multiplier applied to the lodestar of attorney Gaines was also for the contingent character of his representation. The contingency adjustment is designed solely to compensate for the risk that no fee would be recovered. *Bowers,* at 598. At the fee hearing, several witnesses testified that Gaines' chances of recovery were remote;

one witness said Gaines "took an enormous risk in going contingent." There is an inherent incongruity between this prospect and the actions taken.

Not long after undertaking representation of Travis on a contingency basis, Gaines brought Mair in to act as lead trial counsel. Mair's representation was not contingent; Travis agreed to pay him a fixed contract rate of $100 per hour, $1,000 per day of trial and costs. To obligate Travis to such a large fixed liability is inconsistent with the claim that the case had little chance of success. As things turned out, Mair's preverdict attorney fees and costs amounted to $63,130.92, a sum Travis would have had to pay if the "enormously risky" case had been decided adversely. Although this court may not decide facts from the evidence presented at trial, it can decide that as a matter of law under these circumstances, the multiplier was unreasonable.

*Travis v. Washington Horse Breeders Ass'n, Inc.*, 47 Wn. App. 361, 369, 734 P.2d 956 (1987).

We concur with the Court of Appeals that the 1.5 multiplier was unreasonable and was improperly granted.

## V

Two final issues remain to be covered. The first is mutual mistake. Since we have upheld the recovery on the express warranty claim, the issue of mutual mistake need not be reviewed. Second is whether the trial court abused its discretion by excluding evidence of the sellers' repurchase offer. The trial court held this was an offer of compromise and excluded it under ER 408. We find no abuse of discretion, and nothing contrary to this position has been brought to our attention by the sellers.

## VI

In summary, we hold as follows: (1) The finding of an express warranty and thus the liability of sellers is upheld since the express warranty may not be disclaimed. (2) It was error for the trial court to exclude the disclaimers of warranty from the jury in the case of the implied warranties of merchantability and fitness and to give instruction 34. (3) The CPA is applicable to the facts of this case, but it was error for the trial court to refuse the instruction on

the reasonableness defense. (4) The hours and hourly rates for Travis' attorney fees were proper, but it was error for the trial court not to segregate the time allowable to the various legal issues. (5) The denial of the 1.5 multiplier by the Court of Appeals is upheld. (6) We need not decide the issue of mutual mistake, and the exclusion by the trial court of the repurchase offer by the sellers is upheld.

The case is remanded to the trial court for further proceedings consistent with this opinion.

PEARSON, C.J., and UTTER, BRACHTENBACH, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

After modification, further reconsideration denied October 4, 1988.